**REVISED**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 96-20221

CYPRESS-FAIRBANKS INDEPENDENT
SCHOOL DISTRICT,

                                        Plaintiff-Appellee

                        versus

MICHAEL F. b/n/f/ MR. AND
MRS. BARRY F.,

                                        Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Texas

July 15, 1997

Before HIGGINBOTHAM, WIENER, and DENNIS, Circuit Judges.

WIENER, Circuit Judge:

Defendants-Appellants Michael F., by his next friend and parents, Mr. and Mrs. Barry F., ("Michael's parents") appeal from the final judgment of the district court in favor of Plaintiff-Appellee Cypress-Fairbanks Independent School District ("Cy-Fair ISD"). The action arose when Michael's parents, invoking the

Individuals with Disabilities Education Act ("IDEA"),[1] sought reimbursement from Cy-Fair ISD for the costs they incurred in placing their disabled child, Michael, in a full-time private residential education and treatment facility. The school district refused Michael's parents' request, and they appealed administratively to the Texas Education Agency ("TEA"), whose hearing officer ordered reimbursement, finding that (1) the educational program crafted for Michael by Cy-Fair ISD was inappropriate under the IDEA, and (2) Michael's placement at a specialized private residential school by his parents was appropriate. After conducting further fact finding, the district court reversed the hearing officer's decision and also awarded costs to the school district. Concluding on the basis of the entire administrative and judicial record that the district court committed no reversible error when it reversed the hearing officer's decision, we affirm the court's decision on reimbursement, but modify in part its award of costs to the school district and affirm that award as modified.

**I**

**BACKGROUND**

---

[1] 20 U.S.C. § 1400 et seq. (1997). We note that the IDEA was recently amended by Congress. See Individuals with Disabilities Education Act Amendments of 1997, P.L. No. 105-17, June 4, 1997, 11 Stat. 37. As all of the events giving rise to this action occurred before the enactment of the amendments, however, we need not consider their effect in this appeal.

**A. Statutory Framework of the IDEA**

Being a local educational agency responsible for complying with the IDEA as a condition of the State of Texas' receipt of federal education funding, Cy-Fair ISD must (1) provide each disabled child within its jurisdictional boundaries with a "free appropriate public education" tailored to his unique needs,[2] and (2) assure that such education is offered, to the greatest extent possible, in the educational "mainstream," that is, side by side with non-disabled children, in the least restrictive environment consistent with the disabled student's needs.[3] The "free appropriate public education" that a disabled student is entitled to receive under the IDEA must be tailored to his particular needs by means of an "individual educational program" ("IEP"), a written statement prepared at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and, when appropriate, the child himself.[4] In Texas, the persons charged with preparing an IEP are known collectively as an Admissions, Review and Dismissal Committee ("ARD Committee").

The "free <u>appropriate</u> public education" tailored by an ARD Committee and described in an IEP, however, need not be the best

---

20 U.S.C. §§ 1400(c) and 1412(1); <u>Teague Indep. Sch. Dist. v. Todd L.</u>, 999 F.2d 127, 128-29 (5th Cir. 1993).

<u>Id.</u>; 20 U.S.C. § 1412(5).

20 U.S.C. § 1401(20).

3

possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him "to benefit" from the instruction.[5]  In other words, the IDEA guarantees only a "basic floor of opportunity" for every disabled child, consisting of "specialized instruction and related services which are individually designed to provide educational benefit."[6] Nevertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or de minimis;[7] rather, an IEP must be "likely to produce progress, not regression or trivial educational advancement."[8]  In short, the educational benefit that an IEP is designed to achieve must be "meaningful."[9]

When a parent or guardian challenges the appropriateness of an IEP crafted by a state or local education agency and the resulting educational placement, a reviewing court's inquiry is generally

---

Bd. of Educ. of the Hendrick Hudson Central Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 188-89 (1982).

Id. at 201.

Oberti v. Board of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1213 (3rd Cir. 1993).

Board of Educ. of East Windsor Regional Sch. Dist. v. Diamond, 808 F.2d 987, 991 (3rd Cir. 1986).

Polk v. Central Susquehannna Inter. Unit 16, 853 F.2d 171, 182 (3rd Cir. 1988), cert. denied, 488 U.S. 1030 (1989); see also Rowley, 458 U.S. at 192.

4

twofold. It must ask first whether the state or local agency complied with the procedures set forth in the Act, and if so whether "the individualized educational program developed through the Act's procedures [was] reasonably calculated to enable the child to receive educational benefits?"[10] In those instances when a suitable or "appropriate" public educational placement is not available for a disabled child within a state or local school district, the district must pay the costs of sending the child to an appropriate private institution.[11]

In School Comm. of Town of Burlington, Mass. v. Department of Educ. of Mass.,[12] the Supreme Court held that a reviewing court may, in the exercise of the equitable authority granted to it under the IDEA, order public school authorities to reimburse parents or guardians of a disabled child for their expenditures on private schooling when they unilaterally remove the child from public education and place the child in private schooling. But reimbursement may be ordered in such situations only if the parents or guardians establish that (1) an IEP calling for placement in a public school was inappropriate under the IDEA, and (2) the private

---

Id. at 201.

Jenkins v. Squillacote, 935 F.2d 303 305 (D.C. Cir. 1991) (citing School Comm. of Town Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 369 (1985)); Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ., 790 F.2d 1153, 1158 (5th Cir. 1986).

471 U.S. 359, 369 (1985).

school placement by the parents was proper under the Act.[13]  If the reviewing court determines that the school district's IEP was appropriate, it need not reach the issue of the appropriateness of the private placement by the parents.[14]

## B. Particular Facts and Proceedings

At an early age, Michael F. was diagnosed with, and began to receive medication for, Attention Deficit Hyperactivity Disorder ("ADHA").  Based on this condition, Michael was classified as "other health impaired" and was thus entitled to receive educational services under the IDEA from Cy-Fair ISD after he and his family moved there in the summer of 1992.

Michael enrolled as a sixth grader at Cy-Fair ISD's Hamilton Intermediate School (Hamilton) for the 1992-93 school year.  During this school year, Michael was diagnosed with Tourette's Syndrome ("Tourette's"), a neurological or psychiatric behavior disorder typified by involuntary motor and vocal ticks.  Michael's case of Tourette's is manifested by symptoms of (1) hyperactivity and decreased attention, (2) obsessive compulsive behavior, (3) rapid mood swings, and (4) ticks and twitches.

Acting through an ARD Committee convened in August 1992, Cy-

---

Id. at 370; see also Florence County Sch. Dist. Four v. Carter, 114 S.Ct. 361, 366 (1993).  Reimbursement will be permitted under Burlington when unilateral placement by parents is generally found to be appropriate, even though it is not "the exact proper placement required under the Act."  Alamo Heights, 790 F.2d at 1161.

Teague, 999 F.2d at 132.

6

Fair ISD instituted a provisional IEP for Michael's 1992-1993 school year at Hamilton. Under this initial IEP, Michael attended regular classes and had access to a "content mastery class." In October of 1992, the ARD Committee supplemented Michael's IEP with a "behavioral plan," under which Michael's teachers could discipline him with "time-out" and "cooling off" periods when he became agitated, send him to counseling sessions with the assistant principal, or send him to special discipline management classes. Michael's parents approved both the initial IEP and the October behavioral plan.

Michael's deportment problems ebbed and flowed throughout the 1992-93 school year. During the fall semester, his misbehavior consisted mainly of relatively minor disruptions such as yelling inappropriately on the bus and in class, calling other students and himself gay, touching students on the legs in a sexual way, talking back to his teacher, licking his books and papers in class, one scuffle, and one fight. This behavior landed Michael in the principal's office, detention hall, or discipline management class on numerous occasions and also resulted in several temporary suspensions from the school bus.

Beginning in January of 1993, however, when Michael was first diagnosed with Tourette's and his medications were juggled in an attempt to reduce the severity of his Tourette's' symptoms, his behavior worsened. Not only did he continue to disrupt class and cause trouble elsewhere in the school environment, but Michael

7

increasingly became involved in fights, and on February 15 and 17 —— just when a powerful and potentially beneficial drug with strong side effects was being introduced into Michael's medication regimen —— his temper flared in two physically violent episodes. As a result of these episodes, Michael was removed from school on an emergency basis and faced possible expulsion until the ARD Committee determined, after receiving reports from Michael's attending psychiatrist and psychologist, that Michael's misbehavior was directly related to his disability. Agreeing with the recommendation of Michael's psychiatrist, the ARD Committee assigned Michael to a homebound placement for approximately six weeks so that his doctors could complete medication trials and stabilize his medical treatment, after which the Committee could reevaluate Michael's IEP.

Just before Michael's outburst of physically violent behavior in mid-February, however, the ARD Committee had resolved that Michael's needs would be better addressed with a more consistent behavioral structure throughout the day. It had, therefore, placed him in a self-contained, adaptive behavior classroom for three subjects (English/Language Arts, Math, and Social Studies),[15] while leaving him in regular education classes for Science and Physical

---

An adaptive behavior class is specifically designed to help students learn to control inappropriate behavior. The student stays in the same classroom for several subjects, and a level point structure is used which enables students to gain rewards throughout the class period by exhibiting appropriate behavior.

Education ("P.E.")  The ARD Committee also supplemented Michael's program by providing him with a social behavior curriculum in his adaptive behavior classes, psychological counseling services, and a discipline contingency plan.

When Michael returned to Hamilton on April 2, he was again placed in a slightly expanded version of the adaptive behavior program that he had only briefly begun in mid-February.  Michael's disruptive and aggressive behavior continued more or less unabated for the remainder of the school year, resulting in several short suspensions, including one for the last two days of school after he announced in class that he was going to kill his mother, spat in a student's face, hit the student, and directed obscene language at his teacher.

When the ARD Committee convened on May 26, 1993 to review Michael's situation and plan for the next school year, it learned that Michael was passing all of his courses and had made progress towards achieving all of the academic goals listed in his IEP, but had not yet achieved mastery in any academic area except for general science.  On the deportment front, Michael's adaptive behavior teacher noted that Michael was able to refocus after incidents of misconduct.  Largely at the insistence of his parents who feared that his continued exposure, in adaptive behavior classes, to other children with emotional and behavioral problems would harm Michael, the ARD Committee determined that Michael could be placed in the regular education program at his local junior high

9

school for the 1993-94 school year. Michael's parents and the ARD Committee hoped that the combined effect of a new school, the intervening summer recess, and attention to medication would improve Michael's behavior. Michael's IEP for the impending school year, however, still included a number of support services and plans specifically designed to address Michael's behavioral problems. Among these were a discipline contingency plan for teachers to use in dealing with Michael's conduct, a behavioral intervention plan, psychological counseling services, a tracking teacher to monitor Michael's progress, and a handpicked team of teachers who were to receive training on how to cope with Michael's disabilities and behavior. At the conclusion of the meeting, Michael's parents signed the Committee's report, noting their agreement with the IEP and Michael's placement for the 1993-1994 school year.

Over the summer, Michael's behavior at home deteriorated to the point that in late July his parents considered following his psychologist's advice and hospitalizing him or placing him in a summer program at a residential treatment center. But Michael's parents ultimately chose to keep him at home for the duration of the summer.

In August 1993, Michael began seventh grade at Cy-Fair ISD's Bleyl Junior High School ("Bleyl"). During his first month of school, he continued to disrupt class with some frequency, exhibited disrespect for and even directed insults at authority on

10

occasion, and several times became entangled in fights. His misbehavior resulted primarily in "time-outs," detention hall assignments and "cooling off" sessions at the assistant principal's office, but on three occasions he was sent home from school for the rest of the day.

In light of these continuing behavioral problems, the ARD Committee convened a meeting on October 4, 1993, which was attended by Michael's parents, the chairman of the Special Education Department at Bleyl, a psychologist from the school district who had worked with Michael, an educational diagnostician from the school district, the assistant principal at Bleyl responsible for Michael, and Michael's tracking teacher. The Committee was informed that, although Michael was passing every course but one and was receiving satisfactory conduct marks in every class but two, he was having difficulty turning in homework assignments in the majority of his courses and was still experiencing behavioral problems. The Committee therefore altered Michael's IEP, placing him in adaptive behavior classes for Math, English/Language Arts, and Texas History and leaving him in regular education classes for Science, Reading, Industrial Technology, Speech, and P.E. The Committee also determined that Michael was eligible for an optional content mastery class and modified his discipline contingency plan by providing teachers with the option of sending Michael to a discipline management class for the remainder of a class period, as opposed to an emergency removal from class, when his misbehavior

11

escalated.  Once again, Michael's parents approved the IEP that resulted from this meeting.

On the very next day of school, however, before he had even begun the new adaptive behavior program designed by the ARD Committee, Michael got in a fight with a girl in class and, before the fight was broken up, had pinned the girl to the floor with his knee and pulled out some of her hair.  As a result of this incident, Michael was "emergency removed" for the remainder of that school day and the next day.  Michael's parents perceived this incident as a serious escalation of Michael's behavioral problems and therefore renewed their previous consideration of alternative placements for Michael, including a residential psychiatric institution.

On October 7, 1993, Michael began his partial placement in adaptive behavior classes.  He continued to misbehave on the school bus, disrupt classes on occasion, and in a few instances refuse to suit up for P.E., all of which necessitated "time-outs" and "cooling off" sessions with the assistant principal.  Still, his physical aggression from this date forward until his removal from Bleyl consisted of but a single scuffle in P.E.  Furthermore, during the remainder of his time at Bleyl, he was only emergency removed from school once, for half a day, after refusing to take medication and being disrespectful to a school nurse.  On his own volition, Michael later apologized to the nurse for his behavior. Throughout this period, Michael ate lunch in the school cafeteria

12

unattended and passed through the school hallways without being escorted by school staff.

Michael's academic performance during his final month at Bleyl was inconsistent but far from hopeless. A progress report issued on October 26 for the first nine weeks of school indicated that Michael was failing or had incompletes in all but one subject. Nevertheless, Michael's final report card from Bleyl, issued in November after he was removed by his parents, reflected that Michael had turned in previously incomplete assignments and was again passing in his three adaptive behavior classes (Math, English/Language Arts, and Texas History) and in one other academic course (Industrial Technology), was close to passing in two others (Reading and Science), and was only clearly failing in one (Speech). As discussed more fully below, Michael's teachers and the assistant principal have offered sensitive and detailed assessments of his academic and behavioral performances during his enrollment of approximately two months at Bleyl.

Michael's parents removed him from Bleyl and Cy-Fair ISD on November 4, 1993. On November 8, he was admitted to the Provo Canyon School ("Provo Canyon"), a 24-hour residential treatment center located in Provo, Utah. Michael remained at Provo Canyon until February 11, 1994, when his parents brought Michael back home because they could no longer afford the private institution.[16]

_____

Provo Canyon School is approved by the Utah State Board of Education, the California State Board of Education, the Wyoming

13

Meanwhile, on November 18, 1993, an ARD Committee meeting had been convened to consider Michael's parents' request that Cy-Fair ISD approve Michael's placement at Provo Canyon and reimburse them for the costs of the placement. The ARD Committee modified Michael's IEP slightly, in absentia, by deleting Speech class from his curriculum and substituting a "social behavior" class and by deleting the requirement that he change clothes for P.E. But the Committee did not accede to Michael's parents' request that the school district approve Michael's educational placement at Provo Canyon and reimburse them for the costs of this placement. The Committee concluded that his partial placement in the adaptive behavior classroom at Bleyl was the least restrictive environment in which he could receive an appropriate public education under the IDEA.

As was their right under the IDEA,[17] Michael's parents sought review of the school district's denial of their request for reimbursement in an impartial due process hearing before the TEA. A TEA hearing officer conducted eleven days of hearings in April 1993 and, in a lengthy opinion issued on June 17, 1994, found that (1) the IEPs developed by Cy-Fair ISD for Michael's 1993–1994 school year were inappropriate, (2) Michael's placement at Provo Canyon was appropriate, and (3) Michael's parents were therefore

State Board of Education, and the Joint Commission for Accreditation of Hospitals.

See 20 U.S.C. § 1415(b)(2).

14

entitled to reimbursement from Cy-Fair ISD for the $15,978.20 costs of the educational and related services (but not the medical services) Michael received at Provo Canyon.

The school district in turn exercised its prerogative under the IDEA and appealed this decision to the United States District Court for the Southern District of Texas.[18] After a one day hearing in which it received additional evidence, the district court reversed the hearing officer's decision,[19] and, in a separate order, awarded $6,770.05 in costs to the school district as a matter of course under Rule 54(d)(1).[20] Michael's parents have timely appealed from the district court's final judgment and its order awarding costs.

## II

## ANALYSIS

### A. Standard of Review

When a federal district court reviews a state hearing officer's decision in an impartial due process hearing under the IDEA, the court must receive the record of the administrative proceedings and is then required to take additional evidence at the

---

See 20 U.S.C. § 1415(e)(2).

931 F.Supp. 474 (S.D. Tex. 1995).

Id. at 482-84.

15

request of any party.[21]  Although the district court must accord "due weight" to the  hearing officer's findings,[22] the court must ultimately reach an independent decision based on a preponderance of the evidence.[23]  Accordingly, the district court's "review" of a hearing officer's decision is "virtually de novo."[24]  Indeed, given its adducing of new evidence, even evidence of matters that have occurred since the administrative hearing under review, the district court proceeding under the IDEA is a hybrid, akin to a "trial de novo."

We, in turn, review de novo, as a mixed question of law and fact, a district court's decision that a local school district's IEP was or was not appropriate and that an alternative placement was or was not inappropriate under the IDEA.[25] The district court's findings of underlying fact, such as findings that a disabled student obtained educational benefits under an IEP, are reviewed for clear error.[26]  Finally, we note that in this circuit a party attacking the appropriateness of an IEP established by a local

---

20 U.S.C. § 1415(e)(2).

Rowley, 458 U.S. at 206.

20 U.S.C. § 1415(e)(2); Teague, 999 F.2d at 131.

Id.

Id.; Christopher M. v. Corpus Christi Indep. Sch. Dist., 933 F.2d 1285, 1289 (5th Cir. 1991)); see also Salley v. St. Tammany Parish School Bd., 57 F.3d 458, 462 (5th Cir. 1995).

Teague, 999 F.2d at 131; Christopher M., 933 F.2d at 1289.

16

educational agency bears the burden of showing why the IEP and the resulting placement were inappropriate under the IDEA.[27]

**B. The Appropriateness of the IEP's**

As it is undisputed that Cy-Fair ISD complied with the procedural requirements of the IDEA in drafting and implementing Michael's IEP's, Michael's parents may only recover the costs they incurred in unilaterally placing Michael at Provo Canyon if they establish that (1) the IEPs in effect at the time that Michael was removed from Cy-Fair ISD and was in residence at Provo Canyon — namely the October 4, 1993 and November 18, 1993 IEPs — were not reasonably calculated to provide Michael with a meaningful educational benefit, and (2) the parents' placement of Michael at Provo Canyon was appropriate under the IDEA.

**1. The TEA Hearing**

In his carefully written decision, the TEA hearing officer articulated three primary reasons why the IEP in effect at the time Michael was removed from Cy-Fair ISD (the October 4, 1993 IEP) was not reasonably calculated to enable Michael to receive educational benefits. First, despite his recognition that the earlier IEPs developed by Cy-Fair ISD for Michael's 1992-93 school year represented appropriate interim steps designed to benefit Michael based on the facts and information available at that time, the

---

Id. at 1291; Alamo Heights, 790 F.2d at 1158 (citing Tatro v. Texas, 703 F.2d 823, 830 (5th Cir. 1983), aff'd in part and rev'd in part, 468 U.S. 883 (1984)).

17

hearing officer found that these IEP's had not proven successful in managing Michael's behavior. Consequently, because the October 4, 1993 IEP replicated the primary tools of the previous year's inadequate programs (namely, the adaptive behavior classes and behavior management and discipline contingency plans), the October 4, 1993 plan was inappropriate. The hearing officer supported this initial finding by (1) characterizing Michael's behavior during his time at Bleyl, both before and after the implementation of the October 4, 1993 IEP, as "extreme, outrageous, and dangerous," and (2) noting that his behavior included examples of oral and physical abuse of his teachers, school administrators, and other students. Second, the hearing officer found that the absence of a meaningful educational benefit was further exemplified by Michael's generally low self-esteem and by the fact that his October 26, 1993 progress report reflected that he was either failing or receiving incompletes in all of his subjects. Finally, the hearing officer determined that (1) Michael's presence in regular classrooms was so disruptive that it impaired the education of other students, thus indicating that his needs could not be met in the regular education environment,[28] and (2) his behavior did not improve when he was placed in the adaptive behavior classes but continued to occur with the same frequency and level of severity in both his regular classes and his adaptive behavior classes. Taking all this into

_____

See Daniel R.R. v. State Board of Educ., 874 F.2d 1036, 1049 (5th Cir. 1989) (quoting 34 C.F.R. § 300.552 Comment).

18

consideration, the hearing officer concluded that the only way Michael could learn to control his impulsive and aggressive behavior and therefore gain an educational benefit without significantly disrupting others was if he were placed in a highly structured, 24-hour residential treatment facility.

**2. The District Court Proceeding**

The district court did not attempt to refute or discredit each of the hearing officer's findings in support of his conclusion that the school district's educational program for Michael was inappropriate. Instead, following the expert opinion of Christine Salisbury, Ph.D., an educator with considerable experience in the development of educational programs for disabled children, the court posited that there are four factors that can serve as indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA.[29] These are: (1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) positive academic and non-academic benefits are demonstrated. As there is little doubt that Michael's October 1993 IEP (a) was

---

Cy-Fair ISD notes that Dr. Salisbury's four factors are derived from and track the federal regulations which implement the IDEA. See 34 C.F.R. §§ 300.346(a) and 300.531-2 (assessment); 34 C.F.R. §§ 300,500 (least restrictive environment); 34 C.F.R. § 300.343-345 (team approach); and 34 C.F.R. § 346(a)(5) (demonstrated outcomes).

designed with his specific behavioral and academic problems in mind, (b) placed him in educational settings with non-disabled students for at least half of every school day, and (c) involved both Michael's individual teachers and Cy-Fair ISD administrators and counselors familiar with his needs in a highly coordinated and collaborate effort, the court had no difficulty concluding —— and neither do we —— that the first three hallmarks of an appropriate IEP were present.

As for the fourth factor —— demonstrable academic and non-academic benefits —— the district court concluded that Michael's passing grades at the time he left Bleyl to attend Provo Canyon and his ability to attend lunch and pass through the halls between class unaccompanied by school staff constituted significant academic and non-academic benefits achieved by the IEP. We agree that these objective indicia of educational benefit identified by the district court are significant, and we find further support for the district court's conclusion that the October 1993 IEP was reasonably calculated to, and in fact did, produce more than a modicum of educational benefit for Michael in the opinion of those individuals who had the most immediate knowledge of his performance during his enrollment at Bleyl —— the teachers who worked with him on a daily basis, the assistant principal who was primarily responsible for administering Michael's discipline plan, and the school psychologist who counseled Michael during this period.

20

## 3. Additional Evidence of Educational Benefit

Although we cannot recount in detail all of observations of these individuals whose professionalism and concern for Michael was clearly evident in their lengthy testimony before the hearing officer, the following highlights of that testimony are particularly illuminating. First, Laurie Fowlkes, Michael's Science teacher, testified that Michael was generally "on task," demonstrated enthusiasm by volunteering for assignments, often controlled his own behavior when he began to get agitated during lab work by asking for permission to sit down and then putting his head on his desk, and would likely have earned a grade of B or a high C in her class if he had not left Bleyl. Second, Franklin Finch, Michael's Industrial Technology teacher, testified that Michael worked well in small groups, was "on task" 99.9 percent of the time, never demonstrated inappropriate behavior except on his last day in class, and was, in Finch's opinion, trying to keep behavioral problems in check and seeking reassurance in these efforts. Third, Leona W. Henry, Michael's Reading teacher, observed Michael's behavior to be typical of adolescent boys in her class, noted that on the few occasions that warnings or time-outs were required Michael subsequently settled down, and stated that she fully expected that Michael would have passed had he remained in her class.

Perhaps the most important of all Michael's teachers at Bleyl

was Michael Donnelly, an experienced member of the school's Special Education department who served as Michael's "tracking teacher" in August and September and taught Michael's adaptive behavior classes in October and early November. Donnelly testified that, during Michael's stay in his adaptive behavior classroom, Michael's ability to respond to Donnelly as a teacher and carry on a mature conversation improved. Donnelly further observed that Michael increasingly controlled his urges to interrupt class with inappropriate comments and behavior. Donnelly also noted that, at the time Michael's parents removed him from Bleyl, he was earning passing grades in all three academic subjects taken in the adaptive behavior classes (Math, Language Arts, and Texas History). Based on all of this, Donnelly believed that the adaptive behavior classes constituted an appropriate placement for Michael because he appeared to be "buying into the system"; Donnelly and Michael had established a "good rapport"; and neither Donnelly nor anyone else at Bleyl felt endangered by Michael's presence.

Equally impressive in his faith in Michael's gradual but steady progress under the school district's IEP was Robert Fowler, the assistant principal at Bleyl who was primarily responsible for administering Michael's behavior management and discipline contingency plans and whose office Michael visited on numerous occasions. Fowler first pointed out that the frequency of the need for severe disciplinary responses to Michael's behavioral problems (i.e., emergency removal) dropped dramatically after Michael's

22

placement in the adaptive behavior classes under the October IEP. Fowler also reported that he (1) enjoyed "a very good rapport" with Michael, (2) saw a decrease in physically aggressive and otherwise disruptive behavior after Michael was placed in the adaptive behavior classes, (3) was aware of many instances in which the discipline contingency plan worked as intended, that is, Michael successfully returned to work after an in-class "time-out," a session in his office, or a discipline management class, (4) observed some very encouraging instances of Michael's putting himself into "time-out" or taking himself to the assistant principal's office and subsequently regaining his composure, (5) rated Michael's misbehavior as no more severe than other regular education students he saw frequently in his office, (6) found Michael's resistance to "dressing-out" for gym class to be typical of young students confronted with this requirement for the first time, which resistance was remedied under the November 18 IEP, and finally (7) did not believe that Michael posed a danger to students or staff at Bleyl.

Kenneth Greer, Ph.D., a psychologist with Cy-Fair ISD who was knowledgeable about Tourette's and had worked with approximately twenty Tourette's-afflicted students in the school district, authored a detailed report about Michael and testified about Michael's experience in the school district, based on Greer's direct observation of Michael in counseling sessions and other data. In general, Greer reported that (1) the adaptive behavior

23

classes at Bleyl had lessened the frequency and intensity of Michael's misbehavior, in consequence of which his disciplinary referrals had decreased, (2) Michael's initial placement in regular classes at Bleyl was made largely at the request of his parents, (3) Michael was much more cooperative in counseling sessions from the very beginning of his placement at Bleyl, (4) despite his impulse control problems, Michael never posed a threat to others or a danger to the school, and (5) in Greer's view, Michael appeared to trust Mr. Fowler, the assistant principal, as someone with whom he could converse and who provided a safe harbor for him in the school environment.

Finally, we would be remiss if we failed to note the thorough testimony at the district court hearing of Bernard Rosenberg, M.D., Michael's attending psychiatrist in early 1993. A board certified psychiatrist with extensive clinical experience treating children with Tourette's, Rosenberg testified that a placement in adaptive behavior classes for part of the school day is generally the most appropriate one for a student with Tourette's, and, in Michael's case, was particularly appropriate given the average severity of his symptoms and his relative success in his other classes at Bleyl. By contrast, a 24-hour residential psychiatric placement, Rosenberg testified, would be inappropriate because it would deprive Michael of the opportunity to learn to get along with other children and because, in Rosenberg's view, Michael did not pose a danger to himself or others.

In sum, the testimony of all of these individuals who had direct and frequent contact with Michael both in and outside the school setting provides substantial support for the district court's determination that the October 4, 1993 IEP was reasonably calculated to, and in fact did, produce meaningful educational benefits both academically and behaviorally. In addition, their testimony supports the court's rejection of the TEA hearing officer's assumption that the school district's replication of some of the educational tools briefly used during the 1992-93 school year was inappropriate in the context of the 1993-94 academic year. First, Michael's participation in the adaptive behavior classes at Hamilton was limited to the last two months of his sixth grade year. As Dr. Rosenberg explained, this period had followed a series of trying and ultimately unsuccessful attempts to modulate Michael's medications and a six-week homebound placement, events that undoubtedly disrupted the progress and structure of Michael's schooling. Second, Michael's placement in regular classes at the beginning of the 1993-94 school year reflected a choice primarily made by Michael's parents. Third, and most importantly, Michael's experience at Bleyl, albeit too brief for a definitive assessment of its success, was unique and clearly showed a pattern, particularly once he was switched into the adaptive behavior classes, of increasingly more self-controlled behavior and respectable, although not always consistent, academic success. Given all this, the district court cannot be said to have erred in

25

finding that the IEPs developed by Cy-Fair ISD for Michael's 1993–94 school year were reasonably calculated to produce a meaningful educational benefit for Michael.

As it is evident that the IEP's developed for Michael's seventh grade year were specifically tailored to his individual needs and placed him in the least restrictive educational environment consistent with those needs, we conclude that the district court committed no reversible error in determining that these IEPs and Michael's placement within the Cy-Fair ISD were appropriate under the IDEA.[30]  We therefore need not address the

Given the strong factual support for the district court's decision, we also find that the cases specifically cited to us by Michael's parents in support of their claim that the school district's placement was inappropriate and their placement at Provo Canyon was appropriate are readily distinguishable.  In Clyde K v. Puyallup Sch. Dist., No. 3, 35 F.3d 1396, 1401 (9th Cir. 1994), the Ninth Circuit found that a fifteen-year old student with Tourette's and ADHA had been properly placed by a school district, against his parents wishes, in a self-contained, off-campus facility, as opposed to mainstream classes, in light of unrefuted evidence that the student was extremely disruptive and dangerous to others and his well documented failure to obtain any education benefits in the mainstream placement.  In Seattle School Dist., No. 1. v. B.S., 82 F.3d 1493, 1497 and 1500-01 (9th Cir. 1996), the Ninth Circuit held, this time against a school district, that a residential placement, rather than mainstreaming, was appropriate for a student with various behavioral disorders who was not receiving any academic or non-academic benefits in a regular classroom, was severely disrupting class, had become so physically assaultive that she had to be placed in restraints, and ultimately was expelled by the school district.  In Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 886-87 (9th Cir. 1995), the Ninth Circuit agreed with a district court and a hearing officer that a mainstream placement lacking in consistency and structure was inappropriate for a sixteen-year old boy who suffered severe learning and behavior disorders and whose IEP's had produced nothing but failing grades and discouragement for years.  In short, all three of these Ninth Circuit decisions were dictated by

26

issue whether Michael's parents' placement of Michael at Provo Canyon was appropriate.[31]   Accordingly, we affirm the district court's reversal of the hearing officer's ruling that Cy-Fair ISD must reimburse Michael's parents for the cost of sending Michael to Provo Canyon.

## C. Award of Costs

Relying on Federal Rule of Civil Procedure 54(d)(1),[32] the

---

circumstances substantially different than those before us.
Similarly, the district court decisions in <u>Chris D. v. Montgomery County Bd. of Educ.</u>, 753 F.Supp. 922, 929 (M.D. Ala. 1990) (program for emotionally disturbed thirteen-year old boy utterly failed to provide significant educational benefit and in fact may have been harming him), and <u>M.R. v. Lincolnwood Board of Educ., Dist. 74</u>, 843 F.Supp. 1236, 1238 (N.D. Ill. 1994), aff'd, 56 F.3d 67 (7th Cir. 1995) (mainstreaming not appropriate for emotionally disturbed thirteen-year old boy whose deteriorating behavior represented a regression in addition to disturbance of others), finding that more structured placements were necessary, were also based on distinguishable fact patterns.  Much closer factually to the case at bar were the district court decisions in <u>Hall v. Shawnee Mission School Dist.</u>, 856 F.Supp. 1521, 1528-29 (D. Kan. 1994) (IEP calling for partial placement in adaptive behavior class was reasonably calculated to produce educational benefit as demonstrated by child's academic achievement on par with his grade level and gradually improving behavior, despite continuing behavior problems at home), and <u>Swift v. Rapides Parish Public School System</u>, 812 F.Supp. 666 (W.D. La.), <u>aff'd</u>, 12 F.3d 209 (5th Cir. 1993) (same), and our decision in <u>Teague</u>, 999 F.2d at 132 (educational benefit of IEP designed for seventeen-year old boy with various behavior, learning and speech disorders evidenced by testimony of student's teacher and school psychologist, fact that student advanced in terms of grade level, and student's increasing ability to focus on particular tasks).

<u>Teague</u>, 999 F.3d at 132.

Rule 54(d)(1) provides:
Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees <u>shall be allowed as of course</u> to the prevailing party unless the court otherwise

27

district court awarded $6,770.05 in costs to Cy-Fair ISD. Michael's parents have challenged this award on a number of grounds. We generally review a decision of the district court to award costs for abuse of discretion.[33] We review the court's discrete factual findings for clear error.

In the district court and here on appeal, Michael's parents have principally argued that the district court's substantial award of costs is inequitable and violates the spirit if not the letter of the IDEA, given the procedural posture of this case. Michael's parents emphasize that it was Cy-Fair ISD which filed suit in district court to appeal the state hearing officer's determination in favor of the parents. Thus they contend that the district court's award of costs here, if approved, would have a chilling effect on the willingness of parents to contest school district decisions vitally affecting their children by putting such parents at risk of being penalized with a substantial cost assessment even when they have managed to prevail at the administrative hearing level. Other parents will now have to think long and hard, Michael's parents urge, before using the administrative procedures that Congress took great pains to make available to them under the IDEA for the protection of their children's interests.

We cannot disagree with the equitable aspects of Michael's

directs . . . .
Fed. R. Civ. P. 54(d)(1) (emphasis added).

Alberti v. Klevenhagen, 46 F.3d 1347, 1358 (5th Cir. 1995).

28

parents arguments on this point. But, as Cy-Fair ISD has noted, the IDEA does not prohibit an award of costs to a school district as a prevailing party in district court even when the parents have prevailed at the administrative level.[34] Consequently, the district court could, without abusing its discretion, interpret this silence as permission to impose costs "as of course" under Rule 54(d)(1).

In this case, however, our review of the award of costs is not limited to the general propriety of the award because Michael's parents also objected to each item included in Cy-Fair ISD's bill of costs. When we review them, item by item, we find that three of these objections clearly have merit, constituting error by the district court in allowing the school district to recover some or all of the costs of the items identified by these three objections.

First, Michael's parents properly objected to the $137.80 cost attributable to the school district's use of a private process server to serve both them and their attorney despite their counsel's having agreed to accept service on their behalf and not having objected to the use of service by mail. As there was

The IDEA does specifically provide that a district court "may award reasonable attorneys' fees as part of the costs to the parents or guardian of a child or youth with a disability who is the prevailing party," 20 U.S.C. § 1415(e)(4)(B) (emphasis added), but it is silent about awarding costs other than attorneys' fees to either parents or a school district as a prevailing party. Even though the doctrine of inclusio unius est exclusio allerius might well support an argument against an award of attorneys' fees under the circumstances, the issue is not before us today, for the district court did not include attorneys fees in its award of costs.

29

nothing exceptional about the parties or the nature of this case, the district court should have denied these unnecessary private service costs.[35]

Next, Michael's parents properly objected to $1004.00 of the $1,319.00 in witness fees and expenses attributable to Dr. Salisbury's round trip airfare. Having checked with the airline Dr. Salisbury used, the parents noted that even the seven-day advance purchase price for a Pittsburgh to Houston round trip for the date at issue was less than $385.00. The school district provided no reasonable explanation why Dr. Salisbury's plane ticket could not have been purchased at least one week in advance, particularly as there is no record evidence that the one-day hearing in the district court was either scheduled or changed at the last minute.[36] Thus, the witness fees and expenses recoverable by Cy-Fair ISD should have been reduced by $619.00, being the difference between Dr. Salisbury's actual plane fare and the maximum amount she would have had to pay for a seven-day advance fare.

Finally, Michael's parents objected to $3,657.55 in costs incident to four depositions purportedly taken by the school

---

See Zdunek v. Washington Metro. Area Trans. Auth., 100 F.R.D. 689, 692 (D. D.C. 1983).

28 U.S.C. § 1821(c)(1) provides for the payment of travel expenses of witnesses who travel by common carrier, but specifically states that "a witness shall utilize a common carrier at the most economical rate reasonably available."

30

district in preparation for the district court hearing, which expenditures the parents assert were not "reasonably necessary."[37] The deponent in one of those depositions was of Michael's parents' expert, Gina Novellino, Ph.D., Michael's psychologist who was unavailable for live testimony and whose deposition was introduced as an exhibit at trial. The cost of this deposition was not erroneously taxed to Michael's parents. The other depositions, however, were those of the school district's own witnesses and were not introduced at trial because of Michael's parents' objections. As the school district had to have known in advance that these witnesses would have to be called for live testimony in open court at the district court hearing, their depositions were surplusage and cannot properly be taxable to Michael's parents as "reasonably necessary" under these circumstances. Accordingly, the school district should not have been allowed to recover the $2,176.40 cost of these three depositions.

In conclusion, we hold that the district court did not abuse its discretion in general when it elected to tax costs to Michael's parents, but clearly erred in its findings of fact as to the proper amounts for the three categories of costs discussed above, i.e., private process service, plane fare, and deposition expenses. We therefore conclude that the award of costs to Cy-Fair ISD should be

Copper Liquor, Inc. v. Adolph Coors Co., 684 F.2d 1087, 1099 (5th Cir. 1982) (A deposition is taxable as a cost so long as "the taking of the deposition is shown to have been reasonably necessary in light of the facts known to counsel at the time it was taken.").

31

reduced by $2,933.20, to $3,837.40.

### III

### CONCLUSION

Having concluded that the district court did not err reversibly in finding that the IEPs designed for Michael and Cy-Fair ISD's resulting placement of Michael in his local junior high school were reasonably calculated to produce a meaningful educational benefit and were therefore appropriate under the IDEA, we affirm the district court's reversal of the TEA hearing officer's ruling that the school district must reimburse Michael's parents for the costs of their unilateral placement of Michael in a private full-time residential school. Furthermore, we modify the district court's award of costs under Rule 54(d)(1) as discussed above and affirm that award as modified.

JUDGMENT AFFIRMED; ORDER MODIFIED and, as modified, AFFIRMED.