CARL E. STEWART, Circuit Judge,
dissenting.
As the majority notes, DefendanL-Appellee Per Hovem is an intelligent former student of Plaintiff-Appellant Klein Independent School District (KISD). Though Per was a gifted student in other areas, he suffered from a special learning disability in the area of written expression, which is covered by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. When Per’s parents, Defendants-Appellees Knut and Signe Hovem, realized that he was not improving in his area of disability, they removed him from KISD and enrolled him in the Landmark School, which specializes in language-based learning disabilities. Per’s parents subsequently filed an administrative complaint, seeking reimbursement for Per’s educational expenses at the Landmark School. Both the Texas Education Agency special education hearing officer assigned to the case and the district court, upon review of the extensive administrative record, concluded that KISD had failed to provide Per a free appropriate public education (FAPE) as required by the IDEA. Contrarily, the majority concludes that KISD satisfied its obligations under the IDEA by mainstreaming Per into the regular education classroom setting, where he achieved passing marks. As the majority improperly displaces our deferential review of a district court’s factual determinations rendered in the IDEA context, and as the majority’s holding can be interpreted to permit federally-funded school districts to circumvent the purposes of the IDEA by socially-promoting disabled students in mainstream curricula without addressing the individualized special needs of their respective disabilities, I respectfully dissent.
I.
We review de novo, as a mixed question of law and fact, the district court’s decision that a school district failed to provide a FAPE under the IDEA; however, the district court’s findings of “underlying fact” are reviewed for clear error. Teague Indep. Sch. Dist. v. Todd L., 999 F.2d 127, 131 (5th Cir.1993). Whether the student obtained educational benefits from special education services is a finding of underlying fact. Id. at 131. “The clear error standard of review ‘precludes reversal of a district court’s [factual] findings unless [the court is] left with a definite and firm conviction that a mistake has been committed.’ ” Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P., 582 F.3d 576, 583 (5th Cir.2009) (quoting Jauch v. Nautical Servs., Inc., 470 F.3d 207, 213 (5th Cir.2006) (internal quotation marks and citations omitted)).
The IDEA guarantees a “basic floor” of opportunity, “specifically designed to meet the child’s unique needs, supported by services that will permit him to benefit from *401 the instruction.” Richardson Indep. Sch. Dist. v. Michael Z., 580 F.3d 286, 292 (5th Cir.2009) (citations omitted) (emphasis added). “IDEA does not entitle a disabled child, to a program that maximizes the child’s potential.” Id. “ ‘Nevertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or de minimis; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement.’ ” Juan P., 582 F.3d at 583 (citing Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 248 (5th Cir.1997)) (emphasis added). A school district must provide the student with “meaningful” educational benefit. Id.
The IDEA requires that school districts develop an IEP for each child with a disability, and parents play a significant role in the process. Winkelman ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 524, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007). The IEP is required to include a statement of the child’s present levels of academic achievement, to include “how the child’s disability affects the child’s involvement and progress in the general education curriculum[,]” as well as a statement of measurable annual goals designed to “meet the child’s needs that result from the child’s disability to enable the child to be involved in and make progress in the general education . curriculum[.]” 20 U.S.C. § 1414(d)(l)(A)(i)(I)(aa)-(II)(aa).
II.
We have set out four factors to guide our analysis of whether an IEP is reasonably calculated to provide meaningful educational benefit to a disabled student: “(1) the program is individualized on the basis of the student’s assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key ‘stakeholders’; and (4) positive academic and non-academic benefits are demonstrated.” Michael F., 118 F.3d at 253. “[W]e have not held that district courts are required to consider them or to weigh them in any particular way.” Michael Z., 580 F.3d at 293.
Applying these factors, the district court concluded that the first; third, and fourth factors favored' the Hovems, and only the second factor partially supported KISD’s position. Specifically, the district court found that, after years of being assured that Per was making progress in the area of his disability because he was passing his regular education classes, the Hovems independently sought extensive testing and discovered that Per was functioning significantly below grade level in his area of disability, which prompted them to remove him from KISD and enroll him in the Landmark School.
The district court further found that Per’s IEPs were unchanged for three years of high school, and were not reasonably calculated to enable him to receive educational benefit. The shortcomings of Per’s IEP are evident. Per’s meager annual goals — to achieve passing marks and advance to the next grade level — were not individualized because these are the goals for all students. Additionally, for special services, Per was assigned a computer and portable speller,- which KISD employees, though aware the tools were not being used, made no effort to ensure that he use. KISD likewise failed to research or identify alternative devices to assist Per. Under this program of instruction, Per scored 650 in reading and 640 in' math on his SAT, yet only 320 on the writing portion of the test. He failed the written portion of the Texas Assessment of Knowledge and Skills (TAKS) in three attempts during his final two years in public high school.
*402 Moreover, although Per was mainstreamed into the regular education setting, the district court found that he was not held to the same standards as his non-disabled classmates. Rather, he was routinely excused from turning in homework and permitted to answer questions orally when teachers could not decipher his written work. It is undisputed that, in order to enable Per to graduate from public high school, KISD waived passage of the written TAKS as a requirement for graduation.
The underlying facts, as set forth by the district court in a painstakingly-detailed 124-page written decision, clearly demonstrate to me that KISD failed to address Per’s learning disability in an individualized fashion, as is required by the IDEA. Instead, KISD swept Per’s deficits under the proverbial rug, placing him in the regular education curriculum and setting only generalized educational goals in his repetitive IEPs, making exceptions to enable him to pass his mainstream classes while ignoring that the tools meant to assist him went effectively unused for years, all the while applauding Per’s good grades to his parents as evidence of his progress.
Confronted with these facts, the majority curiously reasons that the district court’s factual determinations are not entitled to clear error review, and instead are subject to de novo review, because the district court had “an erroneous view of controlling legal principles.” This, in spite of the district court’s accurate references to the appropriate legal standards governing this case, including Board of Education v. Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Given the district court’s exhaustive recitation of the law at issue here, as well as the district court’s lengthy explanation of the reasons for its decision, I am convinced that the district court was well aware of the substantive legal standards implicated by the IDEA and engaged in an appropriately rigorous review of the hearing officer’s determination. Moreover, my reading of the record satisfies me that the district court not only recited the correct legal standards, it faithfully adhered to them as well.
Furthermore, the majority has failed to satisfactorily explain how the district court’s purported “erroneous view” of the law misled it in determining the numerous underlying facts, such as the fact the Per’s IEP was unchanged for three years, the fact that Per’s teachers excepted him from written work, the fact that KISD waived passage of the written TAKS as a graduation requirement, and the fact that KISD officials were aware that he did not use his assistive devices yet did nothing. In my view, the majority’s analysis is fueled by an unwarranted usurpation of the role of fact-finder, appropriately reserved to the hearing officer and district court.
III.
Applying our appropriately deferential standard of review to the district court’s factual conclusions, including the district court’s factual finding that Per did not obtain educational benefits from the meager special education services afforded him by KISD, the judgment of the district court and hearing officer should be affirmed. However, even assuming arguendo the correctness of the majority’s contention that de novo review should apply to the district court’s factual findings, there is abundant persuasive evidence in the record establishing that Per’s academic program was not tailored in order to produce meaningful educational benefit, that Per’s academic program was not individualized according to his distinct needs, and that KISD failed to devote significant and serious effort to collaborate with Per and his *403 parents in the development of his academic plan.
The administrative record consists of hundreds of pages, and includes Per’s IEPs and the transcript of the administrative due process hearing. Over the course of three days in December 2008, Per and his family put on eleven witnesses, including two expert witnesses, and KISD put on five witnesses. The following month, the Texas Education Agency special education hearing officer, after considering all of the evidence presented, rendered a twenty-four page decision in Per’s favor. Specifically, the hearing officer determined that KISD denied Per a FAPE because his program of instruction was not developed to address his individualized educational needs.
The record itself is replete with acknowledgments, many from KISD’s own employees, of KISD’s failure to adequately and appropriately respond to the particularized nature of Per’s writing deficit. Instead, Per was thrust into the general curriculum and consistently promoted, all the while his weaknesses were effectively ignored.
For instance, Dr. Mary Rosenberg, KISD’s executive director of student support services, testified at Per’s due process hearing that although school officials were aware that Per had deficits in written expression, reading, spelling, and homework completion, there were no goals and objectives set forth in his IEPs to address these problems. Dr. Rosenberg admitted that KISD’s sole criterion for determining whether to formulate annual goals, objectives, and services to address a student’s deficit is whether the problem impaired the student’s ability to progress in the regular curriculum. Accordingly, so long as Per continued to receive passing marks, KISD, pursuant to its narrow interpretation of its responsibilities under the IDEA, would not implement goals, objectives, or services to respond to his significant educational deficits, of which KISD had long been aware. Dr. Rosenberg further admitted that Per’s IEP’s did not,include goals and objectives related to transition planning, and that his stated goals, to achieve passing grades and progress through the general curriculum, went unchanged from 2006 through 2008.
Mr. Greer, an English teacher at Per’s former high school, testified that 95 percent of students at the school pass the written portion of the TAKS. When Per’s mother became concerned about Per’s lack of progress in his area of disability during tenth grade, she reached out to Per’s counselors, who in turn referred her to Mr. Greer, who admittedly was not specially trained to respond to Per’s unusual deficits. Mr. Greer further testified that school officials did not give him specific details regarding Per’s learning problems.
Mr. Greer soon realized that Per would require significant help to prepare him for the TAKS. While it took an average tenth grader less than a minute to write a sentence, it took Per ten to fifteen minutes. It could also take Per three or four days to write a paragraph. Yet, no one associated with KISD suggested that Per have regularly scheduled sessions with Mr. Greer, who would have been willing to participate as his schedule permitted. Mr. Greer testified that he .ultimately had three or four tutoring sessions with Per, which did not even attempt to address Per’s spelling difficulties.
After failing the written TAKS in eleventh grade, Per was assigned to Mr. Greer’s writing skills class, which was assigned to all students who failed the written TAKS, in twelfth grade. Mr. Greer testified that Per would “labor” over his work, a contrast to the majority’s description of him, which suggests that Per was *404 simply unwilling to improve his performance. Mr. Greer was aware of only one academic goal for Per: that he pass the TAKS test. Mr. Greer testified that he believed Per was a regular education student with accommodations, rather than a special needs student. Mr. Greer testified that Per rarely used his portable speller and preferred to look words up in the dictionary himself. As expressed above, in spite of being a student in Mr. Greer’s writing skills class, Per failed the written TAKS twice more during his senior year.
Ms. Marek, Per’s senior year English teacher, also testified at his due process hearing. She 'admitted that she was not a special education teacher, and had received no training to address Per’s learning disabilities in the two years prior to the hearing. She recalled an occasion during the spring of Per’s senior year when he demonstrated significant difficulty in completing an in-class essay assignment, putting his hand on his forehead. Following this incident, Ms. Marek took it upon herself to notify Per’s parents and suggest assistive technology. As a result of her efforts, Per was given the Kurzweil computer program for use in his writing assignments. The program allowed Per to complete work more swiftly; however, even with the assistance of the program, it took Per forty minutes to complete a short essay while it took an average student only ten minutes.
Dawn McDonald, an occupational therapist for KISD, also testified at the due process hearing. Ms. McDonald admitted that she became aware in tenth or eleventh grade that Per did not use his portable speller, but believed that there was nothing that she could do about it. Even after she received reports from teachers that Per did not use his speller, she did not address those reports with him. When asked whether she would describe Per’s failure to use the portable speller in class as a refusal of help, Ms. McDonald answered that Per is “the most respectful young man I have ever met in my life” and that she “would never say he would refuse me.” She conceded that when a student’s behavior interferes with his learning, the school is obligated to assess the student’s behavior. However, she admitted, Per’s failure to use his speller was never assessed.
Ms. McDonald testified that she did not recommend any software programs as alternative assistive technology until the spring of his senior year, after Ms. Marek’s urging. More troubling is Ms. McDonald’s admission that she never believed that Per’s portable speller was the best device to assist hün, as she “felt ... the best device for Per had auditory feedback.” Yet, because Per preferred to use the speller without auditory feedback, that is the one she assigned to him. Ms. McDonald admitted that from the fall of 2003 through the fall of 2008, she never brought up the subject of using an auditory feedback speller to Per or his parents.
In January of 2005, Per’s mother requested that he be evaluated for dysgraphia, a writing disorder. Ms. McDonald admitted that it would have been her job to perform such an evaluation. However, as the matter was not properly referred to her, a dysgraphia- evaluation was never performed.
Ms. McDonald acknowledged that she dismissed Per from her occupational therapy services in September of his senior year, even though she was aware by his junior year that Per’s speller was not being used and even though Per had already once failed the written TAKS. Ms. McDonald admitted during her examination that Per’s annual goals, as set forth in his IEPs, failed to provide measurable objectives to enable Per to achieve academically. She also admitted that the “measura *405 ble educational outcomes” section of one of Per’s occupational therapy evaluations improperly included goals, such as copying assignments from the board and producing legible work, that were not in fact measurable.
Hilda Castagnos, an educational diagnostician for KISD, testified that even though her evaluation report indicated that Per had “severe discrepancies between achievement and intellectual ability in the areas of reading comprehension, basic reading skills, and written expression” which were “consistent with a diagnosis of dysgraphia,” she did not find it necessary to assess Per to determine whether dysgraphia was an appropriate diagnosis.
Per testified at the hearing on his own behalf regarding his educational struggles while a student at KISD. Per explained that he has weaknesses in spelling, the ability to read with understanding, and organizing written material. He claimed that KISD officials responded to his unusual disability in a “generic” and “catch all” fashion, pushing him into the regular curriculum without “concern” for his special disability.
Per stated that he tried to use the portable speller, but realized that it was an inadequate tool to help him overcome his very limited understanding of language. Per described in detail why the functioning of the portable speller was so unhelpful to him. Per would first enter into the speller what he believed was the accurate spelling of an entire word; based on this input, the speller produces a list of possible words. If any part of the inputted spelling were incorrect, the list of responses from the speller would “take [him] dramatically off course.” When using the speller, Per essentially resorted to “guessfing]” how to spell words, re-spelling “over and over again until [he found] what [he thought was] the word.” Per testified that he did not use a . speller at Landmark School, where he had made significant progress, as he considered it a crutch which impeded his learning how to spell.
Additionally, Per testified regarding a number of educational approaches employed by KISD which enabled him to pass his courses while bypassing his area of weakness. For instance, Per suggested that, because he was quiet, teachers did not always notice when he did not turn in essays or homework assignments. The use of multiple choice and fill-in-the-blanks worksheets for class assignments obscured his difficulties with spelling, organization, and writing. Per also “reified] heavily on other people[,]” notably his parents and brother, to assist him with take-home writing assignments. Without their help, he surmised, he “would have failed a long time ago in English classes.”
Per further testified that he did not realize how ill-prepared he was to enter the real world until his senior year of high school at KISD, when he began to consider his college options. Only then did he realize that he was unable to complete his college admissions applications without the assistance of his parents. Until this point, he “was held under the delusion [that] all you have to do to get ready for college is finish high school.” He informed his ARD committee that he felt unprepared for college because of his deficits in writing and spelling. He was met with surprise from KISD officials. Per testified that he was never counseled regarding post-high school transition planning.
Per’s mother, Signe Hovem, testified that she witnessed her son experience a breakdown as he attempted to complete his college applications, “inconsolable” because of his inability to do so. Mrs. Hovem explained her belief that KISD officials were not motivated to address Per’s area of weakness because of his strengths *406 in other areas. She noted, however, that “[b]ecause he is intelligent did not diminish the fact that he had needs.” Mrs. Hovem further testified that she and her husband were misled as to the extent of Per’s difficulties by the good grades he received and school administrators’ praise for his progress. Her testimony, which was quoted by the district court in its written decision, dispel’s KISD’s suggestion that Per and his family are aggrieved by their own unrealistic expectations that school officials might cure his disability and maximize his performance:.
We are not asking for the most optimal maximized potential that you keep trying to drag out of witnesses. We are asking that he can function at a sixth grade level. We want to — We don’t even know if he can do that, but we want to have the chance to try, just the chance to see, to prove to ourselves.
Considering the totality of the facts before the district court and hearing officer, it is obvious that Per’s educational plan was not individualized and not tailored to enable him to obtain meaningful educational benefit. Alarmingly, KISD offers no reason why the IEP of an 18-year-old student, with a 142 IQ, who was unable to even complete a sentence within a reasonable time, was totally unresponsive to his problem. In lieu of explanations, KISD casually asserts on appeal, as it did without success before the district court and hearing officer, that it did all that it was required to do for Per under the IDEA by promoting him toward graduation in the regular curriculum, a contention that the majority wholly accepts. In the face of the stark gulf between Per’s academic potential, as reflected in his high IQ score, and his inability to complete simple sentences on an admissions form, the majority readily embraces KISD’s argument, in support of doing effectively nothing in the face of Per’s enormous challenge, as its own. As the facts delineated above so clearly demonstrate, KISD cannot and did not discharge its statutory responsibility merely by offering Per a diploma at the end of his high school career. More was required, as the district court and hearing officer correctly held.
KISD attempts to frame the dispositive issue in this case as whether it was obligated to “cure” Per of his disability. Were that the question before us, the answer would clearly be no. Instead, the question we must decide is whether KISD’s educational program was individualized to address Per’s specific needs, tailored to provide meaningful educational benefit rather than merely trivial advancement. Given the undisputed facts set forth above, I conclude that the answer is no.
IV.
The policy implications of the majority’s opinion are even more troubling. Citing Rowley, the majority reasons that educational benefit in the area of disability is not a primary concern under the IDEA. Rather, the majority asserts, the IDEA’S ultimate goal is the conferral of benefits by the “holistic” educational experience. Accordingly, a school district satisfies its statutory obligation to a disabled child by educating him in the regular classroom and advancing him toward graduation, even if the school did not address his disability and made no effort to do so. Thus, in the majority’s view, regular education is necessarily a sufficient educational benefit under the IDEA, regardless of the response, or the lack thereof, to the student’s special needs.
There are numerous flaws with the majority’s reasoning. First is its over-reliance on and misunderstanding of aspects of Rowley. In Rowley, the Supreme Court ruled that, in light of the district court’s *407 factual findings that a deaf student was receiving an adequate education and easily advancing in grade level, and “that [the student] was receiving personalized instruction and related services calculated by ... school administrators to meet her educational needs, the lower courts should not have concluded that the Act requires the provision of a sign-language interpreter.” 458 U.S. at 210, 102 S.Ct. 3034. Accordingly, Rowley stands for the proposition that, where courts determine that the individualized education plans afforded to disabled children are adequate, “courts must be careful to avoid imposing their view of preferable educational methods upon the States.” Id. at 207,. 102 S.Ct. 3034.
The majority disregards the nuance of the Rowley opinion, and instead treats Rowley as a blanket permission slip for federally-funded school districts to ignore the special needs of disabled students by affording them passing grades and advancement in the regular classroom. Although in Rowley the Supreme Court “considered Amy Rowley’s promotions in determining that she had been afforded a FAPE, the Court limited its analysis to that one case and recognized that promotions were a fallible measure of educational benefit.” Hall by Hall v. Vance Cnty. Bd. of Educ., 774 F.2d 629, 635-36 (4th Cir.1985) (citing Rowley, 458 U.S. at 203 n. 25, 102 S.Ct. 3034).
Promotion from grade to grade is less indicative of a disabled student’s receipt of a FAPE where it appears that the student was promoted pursuant to a school policy rather than his achievement, where good grades are traceable to exemptions from standard expectations intended to circumvent rather than address his area of disability, and when independent evaluations contradict the amount of progress otherwise to be inferred from class promotion. See id. at 636 (holding that “[t]he district court did not err in discounting [the student’s] promotions in light of the school’s policy of social promotion and [his] test scores and independent evaluations”); D.B. v. Bedford Cnty. Sch. Bd., 708 F.Supp.2d 564, 584 (W.D.Va.2010) (“Although the [hearing officer] observed that D.B. was promoted a grade every year, [he] failed to comprehend that this token advancement documents, at best, a sad case of social promotion.”); Nein v. Greater Clark Cnty. Sch. Corp., 95 F.Supp.2d 961, 977-78 (concluding that, because dyslexic student “was graded on a modified scale and his tests and quizzes were modified, often being read to him aloud because he was unable to read them[,] ... [his] promotions to the next grade level are not evidence of educational benefit ____”); Smith v. Parham, 72 F.Supp.2d 570, 576 (D.Md.1999) (“[Advancement from grade to grade should not be the only factor considered when determining whether a child is receiving an educational benefit.”); Carl D. v. Special Sch. Dist., 21 F.Supp.2d 1042, 1053 (E.D.Mo.1998) (“Achievement of passing marks and advancement from grade to grade are important — but not dispositive — factors in assessing educational benefit.”).
In this case, there is plentiful evidence that Per’s promotion in classes in which his disability affected his performance was due in large part to the school’s policy of excepting his full participation rather than tailoring his instruction to address his disability. As expressed above, Per was in a posture to graduate only upon the school’s waiver, on the basis of his disability, of the requirement that he pass the written component of the TAKS. Moreover, the battery of tests Per undertook as part of his application to the Landmark School provided measurable data that he was performing significantly below grade level in areas affected by his disability. Accord *408 ingly, Per’s passing grades and presumptive graduation are insufficient to establish that KISD had provided him a FAPE.
Acquiescence to a disabled student’s weaknesses, even if well-meaning, cannot obviate the requirements of the IDEA. Put otherwise, the fulfillment of a school district’s obligations under the IDEA is not a matter of intention. It is entirely reasonable to assume, as the majority apparently does, that KISD’s employees believed that they were doing Per a favor by excusing his failure to complete written assignments legibly, timely, or even at all; by emphasizing his many strengths when grading his performance, yet ignoring his core weaknesses; by matriculating and promoting him through the general education curriculum toward graduation, in spite of the fact that, though he possesses an impressive intellect, he plainly displayed severe difficulty in producing even the most basic forms of written communication, such as words, sentences, and paragraphs, which average students produce with ease.
However, the IDEA requires that a disabled student’s educational plan be “specifically designed to meet the child’s unique needs .... ” Michael Z., 580 F.3d at 292 (emphasis added). The program of instruction “must be likely to produce progress, not regression or trivial educational advancement’ ” Juan P., 582 F.3d at 583 (emphasis added). Clearly, social promotion of disabled students in the general curriculum, even if well-meaning, is inadequate to meet this mandate, both according to our established precedents and the plain language of the IDEA.
Moreover, the majority’s approach ignores that graduation from high school in the regular education curriculum is not the singular purpose of the IDEA. Rather, the IDEA plainly requires that school districts prepare disabled students for life after high school as part of the IDEA’S remedial scheme. Beginning not later than the first IEP to be in effect when a disabled student is 16, an IEP should include “appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, [and] employment!,]” and “the transition services (including courses of study) needed to assist the child in reaching those goals[.]” 20 U.S.C. § 1414(d)(l)(A)(i)(VIII)(aa)-(bb). Transition services are defined as coordinated sets of activities “designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child’s movement from school to post-school activities, including post-secondary education .... ” 20 U.S.C. § 1401(34)(A).
Accordingly, as a disabled student nears the end of his public school education, transition planning becomes an integral part of the development of his IEP. The majority’s contention that a school district does all that is required under the IDEA merely by graduating a disabled child, without even addressing his special needs, is belied by the statute’s emphasis on transition planning and individualized transition services. A school district does not provide a FAPE to a disabled child who aspires to attend college merely by placing him in regular education classes without adequately individualizing his educational program to address his disability and prepare him for life post-graduation.
V.
Because I would affirm the district court’s conclusion that KISD failed to provide Per a FAPE, I would reach the issue of reimbursement for expenses associated with Per’s education at Landmark School. The district court ordered reimbursement *409 for Per’s private educational expenses, with the exception of residential expenses. For essentially the same reasons cited by the district court, I would affirm this determination.
YI.
The approach taken by the majority undermines the rehabilitative purpose of the IDEA by treating individualized education as an afterthought. The majority invites school districts to forgo measured, individualized mainstreaming of special needs students — a laudable goal under the IDEA — in favor of social promotion of disabled students unprepared for the difficult and sometimes harsh world that awaits them after high school graduation. In so doing, the majority rejects our precedents requiring deferential review of the factual determinations of the district courts, and substitutes its own judgment for those of both the district court and the Texas Education Agency hearing officer. For these reasons, I respectfully dissent.