SYLVIE M. b/n/f Diane R., Plaintiff,

v.

BOARD OF EDUCATION OF DRIPPING SPRINGS INDEPENDENT SCHOOL DISTRICT, Tony Wiehl, Debra Miller, Paul Watkins, Glenn Heckermann, Pam Peterson, Pat Sieders, Mike Figer, Lenny Jasinski, Vickie Fuller, James Rosebrock, Charlotte Evans, Toni Carter, Hays–Blanco Special Education Cooperative, and Sharon East, Defendants.

No. A–97–CA–314 SHC.

United States District Court, W.D. Texas, Austin Division.

May 5, 1999.

William C. Bednar, Jr., Law Office of William C. Bednar, Austin, TX, Margie Best, Law Offices of Margie Best, P.C., Oak Park, IL, for plaintiff.

Bridget Robinson, Walsh, Anderson, Brown, Schulze & Aldridge, P.C., Austin, TX, for defendants.

## OPINION

CAPELLE, United States Magistrate Judge.

Before the undersigned are the Administrative Record in this Case filed February 26, 1999 (15 volumes) (Doc # 55); Plaintiff Sylvie M's Additional Brief and Evidence filed March 5, 1999 (Doc. # 56); Defendant's Motion for Judgment on the Record and Supporting Brief filed March 8, 1999 (Doc. # 57); Plaintiff's Reply Memorandum filed March 26, 1999 (Doc. # 60); Defendant's Response and Motion to Strike filed March 29, 1999 (Doc. # 61) and Plaintiff's Response to the Motion to Strike filed April 13, 1999 (Doc. # 62). The Motion to Strike is denied and the Court has considered all the evidence in reaching its decision.

### BACKGROUND

This case presents the issue of who should bear the cost of educating a troubled high school student when her parents decide to unilaterally transfer her from her public high school to a private, restrictive residential school for students with behavorial problems. Plaintiff, Sylvie M., by next friend Diane R. (Sylvie's mother) bring this suit under the Individuals with Disabilities Act (IDEA) seeking to require Defendant, Dripping Springs Independent School District (DSISD), to pay for the placement of Sylvie M at the Élan School, a private residential special education school in Poland Spring, Maine.[1] Defendant asserts that it is not required to pay for Sylvie M.'s unilateral placement in the Élan school because the education it offered to Sylvie M. satisfied the minimum educational standards set out in the IDEA, and thus the removal of Sylvie from Dripping Springs I.S.D. was not required. For that reason, Dripping Springs I.S.D. argues that Sylvie's tuition at Élan (paid by Sylvie's parents) is not recoverable from the school district.

### FACTS

Plaintiff, Sylvie M, was diagnosed as learning disabled in sixth grade and she began receiving special education services at that time. Sylvie is an intelligent girl whose problems are in the areas of short attention span, poor handwriting, becoming discouraged easily, failing to accept responsibility for her actions, and, most of all, not completing homework assignments. Sylvie also has a math disability, which first surfaced in fourth grade and was diagnosed in the sixth grade.[2] Sylvie was later diagnosed as having Attention Deficit Disorder (ADD) and was also, after most of the events giving rise to this suit, classified as seriously emotionally disturbed.

Sylvie's parents are divorced and Sylvie resided with her mother during the school year. Sylvie is an only child who always

---

1. Plaintiff brings related claims under the Rehabilitation Act. The regulations promulgated under Section 504 of the Rehabilitation Act provide that compliance with the IDEA's procedures satisfies the requirements of Section 504. Since the relevant federal regulations and case law indicate that requirements of the Rehabilitation Act may be satisfied through compliance with IDEA, it appears these separate Acts create a nearly identical substantive right to receive a free appropriate public education. As such, the claims will be addressed jointly.

The undersigned notes that Plaintiff's claims under 42 U.S.C. § 1983 and all claims raised against the individual defendants were previously dismissed.

2. Sylvie's mother indicated at the hearing that she also was impatient about math and "very bad in math."

received a lot of attention and interest from her parents, especially her custodial mother. Despite this interaction, when Sylvie reached middle school, she began lying to her mother about school work and whether assignments had been completed. Sylvie's mother was highly involved in the educational process and took homework (and Sylvie's failure to complete it) very seriously and frequently consulted with Sylvie's teachers.

Sylvie's father lives in Paris, France, where Sylvie spent the majority of her summers. In the summer between seventh and eighth grade, Sylvie's parents decided that she would reside with her father for the eighth grade school year and attend school in Paris. The same problems arose at the Paris school and with Sylvie's father, namely Sylvie continued to lie about school assignments and failed to complete assignments. In March, 1995, Sylvie swallowed a quantity of aspirin, was rushed to the hospital, and her stomach was pumped. This incident was the first in a series, all of which occurred close in time to report cards or interim reports from schools.

On March 22, 1995, Sylvie returned to the United States and reenrolled in the Dripping Springs I.S.D. Sylvie's school counselor, Bridget Cave, was told about the problems in France and the suicide attempt. Sylvie's Admission, Review, and Dismissal Committee (ARD) approved content mastery classes for one hour a week. The ARD committee, including Sylvie and her mother, believed Sylvie to be adjusting fairly well as of May 4, 1995. Dripping Springs I.S.D. did not further evaluate Sylvie to determine if she needed additional services or had additional disabilities.

During the time Sylvie was in Paris, her mother remarried. Although Sylvie's relationship with her new step-father, Ron, had previously been amicable, the relationship quickly deteriorated after Sylvie's return from Paris, partially because Ron be-

gan to take an active role in Sylvie's life, including ensuring she completed homework.[3] When Ron tried to help Sylvie with her homework, she resisted and lied about completing homework and other household chores. Sylvie was jealous of Ron's place in Sylvie's mother's life and home. Sylvie's lying was a major point of contention between her and Ron and Sylvie's mother. On May 17, 1995, Ron spanked Sylvie. Sylvie went to school the next day and accused her stepfather of physically abusing her. Although Sylvie's mother later characterized Sylvie as being "caught out" as falsely claiming that she was abused, there was evidence that Ron slapped Sylvie quite hard on her right leg, leaving a handprint bruise. While this did not rise to the level of "abuse," school officials, when shown the bruise by Sylvie, were required to report it to Children's Protective Services. CPS duly investigated and later dismissed the charge. After family counseling, it was decided that Ron would not handle Sylvie's discipline, leaving that task solely to Sylvie's mother.

Sylvie's dislike of Ron increased and she threatened to commit suicide if her mother did not leave Ron. Sylvie's mother informed Sylvie's school counselor, Ms. Cave, about the suicide threat. Sylvie was then placed by her mother at Shoal Creek Hospital, where she remained until after the end of the school year. During her treatment at Shoal Creek, Sylvie repeatedly expressed the desire that she not have to return home and expressed her hatred and jealousy of Ron and her problems in dealing with her mother's mood swings. A treating psychiatrist, Dr. Ceballos, evaluated Sylvie and stated if she continued with her desire not to be at home with her family, he would recommend residential placement.

Sylvie suffered serious issues related to her father's sexual orientation and her mother's remarriage. Sylvie remained at Shoal Creek for two weeks. She was diagnosed as having major depression, dysthemia, parent-child conflict, and attention deficit hyperactivity disorder (ADHD).

3. Sylvie's mother is a nurse who was apparently working the evening shift at that time.

Ron, who had no biological children, took over supervising Sylvie in the evenings.

Anti-depressant medication and ritalin were prescribed.

Over the summer, Sylvie continued in private therapy with Dr. Ceballos. Ms. Cave and the Dripping Springs I.S.D.'s ninth grade counselor, Dr. Evans, discussed Sylvie's progress with Dr. Ceballos. Before entering ninth grade (the first year of high school), Sylvie's mother informed two Dripping Springs I.S.D. employees charged with IDEA issues about Sylvie's problems.) An ARD was convened to address Sylvie's school year (an ARD Sylvie also participated in) and individual and group counseling was recommended as well as content mastery. The group counseling (½ hour per week) began soon thereafter and Sylvie willingly participated and became a leader in the group. Sylvie was given the opportunity to go to the group conselor for individual counseling if she wished to do so. At that time, Sylvie appeared to be adjusting well to Dripping Springs High School.

Sylvie passed all of her classes the first six weeks. Sylvie's class participation was very good during this time. Sylvie, however, had failing progress grades the second six weeks. This was primarily because she did not hand in any homework. There was repeated and undisputed evidence that it is very common for ninth graders to have trouble adjusting to high school and that students' grades and adjustment generally improve noticeably as they advance grades during their high school years.

Over Thanksgiving, Sylvie's mother received a progress report on the third six weeks which showed that Sylvie was still failing to complete classwork, homework, and projects. Sylvie and her mother argued. Sylvie later told her mother she had taken an overdose of aspirin and her mother rushed her to Shoal Creek Hospital, where Sylvie's stomach was pumped. During this time period or before, Dr. Ceballos had told Sylvie's mother that she needed to step back and let the school handle the homework issue.

Sylvie's mother told school officials about the incident the following Monday and met with a counselor and the principal, Dr. Rosebrock. During this meeting, Sylvie's mother expressed concern over Sylvie and also told about numerous stresses and traumas in her (the mother's) work and personal life. Sylvie was then referred to the school's Campus Action Program (CAP), which assists students in crisis. Vicki Fuller, a ninth grade regular education counselor (substituting for Dr. Evans) called Sylvie in for a one-on-one conference Monday afternoon. Sylvie's appearance surprised Ms. Fuller because Sylvie did not look at all like a depressed child or a child in conflict. Sylvie told Ms. Fuller that she had only taken four Tylenol, knew it wouldn't hurt her, and had done it and told her mother about it so her mother would stop arguing with her over her report card. Ms. Fuller had Sylvie sign a "Stay Alive Contract." According to testimony at the hearing, such a contract is a common, indeed automatic response to threats of suicide or suicide attempts even if the threat is not considered to be serious. The degree of follow-up on these contracts relates to the perceived seriousness of the risk. Despite her threats, Sylvie was not seen as a high risk for suicide. Rather, she was seen as using threats of suicide as emotional blackmail against her mother. In this case, since Sylvie's mother disclosed to the school Sylvie's actions, it was obvious that Sylvie's family was aware of the incident. As such, there was believed to be no need to disclose the suicide contract to Sylvie's mother.

Sylvie's first individual counseling session occurred that Tuesday with Sandy Gravenor, a special education counselor. After the session, Sylvie told Ms. Gravenor that she had took the aspirin only to get her mother's attention and said she didn't really want to kill herself. Sylvie indicated she liked Shoal Creek. After the session, Ms. Gravenor was of the opinion that Sylvie was not a suicide threat and that her problems emanated from a conflicted relationship with her mother. Sylvie also agreed for Ms. Gravenor to tell all of her teachers about the suicide gesture so they

were aware that some problems were occurring in Sylvie's life. At some point, Sylvie also indicated that she was considering living in a foster home and she asked Ms. Gravenor how she would go about being placed in a foster home. Ms. Gravenor checked in with Sylvie on Wednesday and checked with Vickie Fuller on Friday. Ms. Gravenor stopped by at least once a week to check on Sylvie through the Christmas break. Ms. Gravenor perceived Sylvie to be experiencing similar problems as many other freshman and that her ninth grade experience was not atypical. Ms. Gravenor thought Sylvie had a certain uniqueness, however. Ms. Gravenor believed that it could "break her spirit" to be forced to conform. Ms. Gravenor saw no problems with Sylvie being able to make friends and she believed that Sylvie was very "stylish." Ms. Gravenor believed that Sylvie would benefit from therapy. The purpose of the study skills class added during her second semester was to try to diffuse some of the home tensions caused by Sylvie's failure to turn in homework.

During this time, Sylvie may have continued to see her private psychiatrist, Dr. Ceballos and the family also received counseling from a Shoal Creek psychologist, Charlotte Cooper. However, her compliance with her medications was sporadic at best and, on the advice and encouragement of her parents, she ultimately stopped taking her medication in December, 1995. Sylvie was ultimately diagnosed as having a primary disability of emotional disturbance (bipolar disorder) with a secondary disability of learning disability (the ADHD and math disabilities).

During this time period, Sylvie was being verbally harassed by a fellow student. This student, who was male, repeatedly asked if Sylvie was a "dyke" and otherwise harassed her. There was no physical harassment. Sylvie asked her mother not to do anything about it because it would only get worse if she complained. Sylvie's mother reported the harassment to Mr. Rosebrock but was unable to identify the full name of the perpetrator and refused to allow Mr. Rosebrock to discuss the situation with Sylvie. This prevented Mr. Rosebrock's from investigating and resolving the harassment. Sylvie's mother ultimately wrote a letter to the boy's parents which contained certain insults and allegations about them and their son.

On December 8, Sylvie's three year review was completed. The educational diagnostician, Toni Carter, was aware of Sylvie's recent suicidal gesture and her treatment at Shoal Creek. Ms. Carter described Sylvie as a "sparkling" person. Sylvie discounted the suicide threat as a parental dispute and Ms. Carter did not see Sylvie as a suicide risk. Ms. Carter determined that Sylvie, although not performing to her academic potential, was receiving educational benefit. Sylvie's math disability was again recognized and Ms. Carter recommended that she continue to receive content mastery classes, especially in math, and find a peer tutor for math. Ms. Carter knew that Sylvie was diagnosed as suffering from bipolar disorder and ADHD. However, the testing did not demonstrate any significant emotional or behavioral deficits.

Sylvie was not referred for further psychological testing. The primary reason Sylvie was not referred is that she did not act like she was emotionally disturbed at school and it was believed that Sylvie's private psychiatrist, Dr. Ceballos, was addressing any problems and he was likely in the best position to report on Sylvie's psychological health. Ms. Carter recommended that the January ARD address Sylvie's emotional condition and, if it was decided that psychological testing was appropriate (as opposed to merely consulting Dr. Ceballos), they could obtain Sylvie's mother's permission for psychological testing at that time, since Sylvie's mother was a member of the ARD.

Sylvie failed two classes for the fall semester, World History and Health. Sylvie's History and Health teachers indicated that Sylvie's failure to turn in

homework seriously damaged her final grade.[4] However, she often did well on quizzes and participated actively and intelligently in class discussions. Sylvie's behavior in these classes was social and appropriate and neither teacher noticed anything out of the ordinary. Both teachers were aware that Sylvie attended Content Mastery and they encouraged her to utilize this program. Both teachers were also aware that her mother had reported that Sylvie suffered from mood swings and had made a suicide threat in November of 1995. Both teachers believed that despite her failing grades, Sylvie received educational benefit in their classes and was capable of passing their classes.

Sylvie's ARD met on January 16, 1996, at which it was Sylvie's failure to turn in work was discussed. The ARD decided that further psychological testing was unnecessary due to Dr. Ceballos' relationship and knowledge of Sylvie and that fact that Sylvie's mother had invited one of her and Ron's friends, a psychologist, to live with them for a short time and help with Sylvie.[5] The ARD, on the recommendation of Sylvie's mother, decided it would be more effective to ask Dr. Ceballos to address whether Sylvie should be classified as emotionally disturbed and Ms. Carter sent him a letter and some of Sylvie's records. Sylvie's IEP was also adjusted in an effort to meet her needs.

On January 29, 1996, Sylvie's mother learned that Sylvie was failing three classes because she was not completing assignments or turning in homework. During this period of time, Sylvie and her mother argued frequently. On the night of February 14, 1996, Sylvie stormed out of her house about 7:30 p.m. as a result of an argument with her mother about Sylvie's smoking and Sylvie's door having come off its hinges due to her repeated slamming of the door. Because the door was off its hinges, Sylvie could not close or lock it. Sylvie returned three to four hours later. Although this was characterized by her mother as a "running away" incident, the time lapse is insufficient to truly call it that. The next day, Sylvie's mother called Ms. Fuller and asked her to recommend private counselors. Ms. Fuller made an appointment for Sylvie at the Scheib Center in San Marcos. Ms. Fuller called Sylvie in for a counseling session on February 16 to follow-up on the incident. Sylvie's belief at that time was that her family situation was "hopeless." She did not refer to any school problems (in fact she apparently felt favorable about school) but rather focused on the problems with her mother and step-father.

On February 16, Sylvie's father contacted Ms. Fuller from Paris. Sylvie's father and Ms. Fuller both perceived Sylvie and her mother's relationship to be in "crisis." They discussed Sylvie's home environment and whether Sylvie should be placed in a residential boarding school, near Dripping Springs if possible. The San Marcos Baptist Academy was discussed as a possible placement but no decision was reached. Ms. Fuller did not recall him asking about any need for placement in a behavioral or psychological treatment facilities. The funding of the placement was not discussed.[6] Ms. Fuller's understanding was that Sylvie's father believed it would be in Sylvie and her mother's best interests to be separated because Sylvie was so disruptive at home and Sylvie's mother had numerous other crises in her life in addition to Sylvie's misbehavior.

On February 22, 1996, the school received the report from Dr. Ceballos, which

---

4. Sylvie made an 81 on the final exam in Health and still failed because of her abysmal homework record.

5. This friend, Dr. Alfred Jones, was between apartments for a few months and agreed to come help out the family.

6. Sylvie's father recalled that they discussed cost and Ms. Fuller stated she had heard cost could be up to $1500 a day.

indicated that Sylvie suffered from bipolar disorder, depression, and ADHD and that she could be classified as emotionally disturbed. A meeting was planned for after spring break to address any modifications to the IEP. On February 27, Sylvie's mother called Ms. Fuller and told her that Sylvie threatened to commit suicide if made to do her homework. Sylvie's mother was very distressed during the phone conversation and Ms. Fuller testified that, because she knew Sylvie well and did not believe her to be suicidal but rather using it as a threat, she was actually more concerned about Sylvie's mother's mental health. Sylvie's mother asked that she not be asked to ensure that Sylvie completed her homework at home and also asked that Ms. Fuller communicate her problems with Sylvie and homework to Sylvie's teachers.

On March 1, Ms. Fuller met with Sylvie's teachers. In an effort to prevent further conflicts over homework, it was decided that Sylvie would receive tutoring during classes and after school and Sylvie's mother would receive weekly reports concerning Sylvie's progress. At that time, none of the teachers expressed concern about Sylvie's behavior other than Sylvie's refusal to complete homework and her excessive socializing ("goofing off") during some of her classes. All of the teachers believed that Sylvie was learning despite her grades. All of the teachers agreed to work with Sylvie to resolve the problems. One-on-one tutoring was to be offered in geography, one of Sylvie's weaker subjects. Although Sylvie was also doing poorly in Theater Arts, Sylvie believed her Theater Arts teacher was gay and did not like him because he gave her bad memories of her father. For that reason, no remediation was offered in that class and she was going to be permitted to substitute a study hall for that class. It was believed that this new program would resolve Sylvie's school problems.

Ms. Fuller met with Sylvie on March 1 and told her about the new program. Ms. Fuller told Sylvie that she was "cutting off her nose to spite her face" by refusing to do homework as a way of getting back at her mother. Sylvie indicated that this was possible and stated that she was receptive to the new program.

On March 4, Ms. Fuller met with Sylvie's mother to explain the new program and also met with Sylvie to check her progress. Sylvie was happy during that counseling session because she perceived her mother to be giving her more freedom.

On March 6, Sylvie ran away. Her father came from France to assist in the search, which was highly publicized. Four days later, she was found by her father (with the assistance of one of Sylvie's friends) on Guadalupe Street in Austin near the University of Texas ("the Drag"). Her head was shaved and she wore black makeup and bizarre clothing. She stated her name was Karma. She was very resistant to going back to her mother's house.[7] For that reason, her father agreed to take her back to where he was staying in Austin. Sylvie refused to enter her mother's house and only returned to briefly pack her belongings prior to her departure for Élan.

Sylvie's parents informed Ms. Fuller that Sylvie had been found. Ms. Fuller was unable to immediately convene an ARD meeting because spring break was that week. Sylvie's parents enrolled her in Élan on March 14, before the end of spring break, and notified Ms. Fuller. Sylvie's parents indicated at that time that they were going to seek at least partial tuition reimbursement. Ms. Fuller told them she thought it was unlikely that they would be reimbursed because the educational resources at Dripping Springs I.S.D. had not been fully explored. At that time, a family preservation meeting was scheduled for the next day with a Hays County Family Preservation counsel-

---

7. Sylvie's father testified that she was resistant to going back to school, not to her mother's house. Sylvie was on spring break that week.

or.[8] Ms. Fuller also stated to Sylvie's parents that she disagreed with the placement because she believed that even if Sylvie needed residential placement to separate her from her mother, it could be accomplished closer to home. Ms. Fuller saw the enrollment in Élan as a way of not dealing with the conflicts between Sylvie and her mother.

On March 18, Dripping Springs I.S.D. notified Sylvie's mother that Sylvie was failing three courses. Her failing these courses was primarily attributable to Sylvie's failure to turn in homework. On April 25, 1996 (some two months after her placement) Sylvie's private psychologist, Dr. Ceballos, stated in a letter that "Élan would provide the appropriate structure for Sylvie's education."

Sylvie was by then far outside the geographical boundaries of the Dripping Springs I.S.D. As such, she was unavailable for a psychological test unless Dripping Springs I.S.D. was willing to send a psychologist to Maine. Ultimately, as the litigation progressed, Dripping Springs I.S.D. sent Dr. Keene to Maine in September, 1996 to examine Sylvie.

The Élan School is a private year-round special education, special purpose school for residential students located in Poland, Maine. Élan specializes in older children who are behaviorally impaired. No mood-altering medications (such as medications for bipolar disorder) are allowed. Élan's program is one of behavioral modification. Élan is highly structured with clearly set goals and levels through which the students progress. Students participate in Élan's program and work in and around the school during the day and attend four hours of academic classes at night.[9] According to evidence at the hearing, Élan uses a "confrontational" model with verbal assaults by peers on fellow students who refuse or fail to conform. Sylvie has testified via affidavit in this proceeding that she did not feel adversely "confronted" by her peers or staff at Élan. However, Dr. Keene determined in September 1996 that Sylvie's unwillingness to "confront" other students was a stumbling block to her advancement and that she had decided to cooperate with the program out of fear of being singled out for group confrontation. A progress report by an Élan Director indicates that Sylvie was "confronted" by numerous students during her final days at Élan due to Sylvie's dropping of responsibilities and avoidance of situations. While Dr. Keene approved of Élan for some types of students, he felt the placement was highly inappropriate for Sylvie's needs. Dr. Keene testified that Sylvie was not in need of residential placement for academic reasons.

When Sylvie was tested in September of 1996 by psychologist Greggus Yahr, he found that Sylvie was on par with her peers academically except in the areas of deductive reasoning. Mr. Yahr indicated that Sylvie had low esteem and felt she "couldn't do it" and so gave up on homework very quickly. Mr. Yahr felt that Sylvie had limited emotional coping skills which caused difficulties with the parent-child conflict. Mr. Yahr felt that the Élan placement was appropriate. However, some of Mr. Yahr's conclusions were based on the statements of Sylvie's father that Sylvie ran away because she didn't want to return to school. The great weight of the evidence indicates that Sylvie ran away because she did not want to live with her mother anymore.

Students at Élan do not have homework. Although some of the staff are licensed teachers, there are few to no professionals in the area of psychology. Élan is not licensed as a residential treatment facility by the state of Maine but rather is licensed as a special purpose private school. Sylvie did not receive any psychological counseling while at Élan and she also did not take

---

8. This meeting did not occur.

9. In the summer, they have two hours of classwork a night.

any medication. Élan costs approximately $40,000/year. Sylvie did very well in the program, graduating in December of 1998 and she has returned to Texas and is apparently now attending college. The total cost of Sylvie's placement was $113,155.16. This amount includes payments for tuition, related services, and board and care.

Sylvie's parents requested that Dripping Springs I.S.D. pay for Sylvie's placement at Élan. On April 30, 1996, the ARD met and, based on Dr. Ceballos' report, determined that Sylvie was emotionally disturbed. Sylvie's mother apparently made it clear at the April 30 ARD that Sylvie was not returning to Dripping Springs I.S.D. and that the meeting was, in her mind, solely to qualify Sylvie for residential placement at Élan. The ARD ultimately refused to pay for the Élan placement. Rather, it set out an IEP for the rest of the year that recommended psychological and orthopedic evaluations (which never occurred because Sylvie was already at Élan) and added a behavior management plan. If Sylvie had returned, an ARD would have convened to do a temporary IEP based on the new situation.

In Dripping Springs I.S.D.'s opinion, Sylvie's placement was non-academic because the placement was primarily to resolve out-of-school family conflicts. The school officials on the ARD committee uniformly agreed that the purpose of the placement was to separate Sylvie from her mother and that placement at Élan was unnecessary and not the least restrictive environment for Sylvie. The school district also indicated that it did not feel it had exhausted other in-district alternatives to residential placement, such as additional resource classes, self-contained classes, and day placement under contract. The school district indicated at the hearing that it would not voluntarily pay for a placement in a residential facility such as Élan unless all other academic alternatives had been exhausted.

After the ARD in April, 1996, Sylvie's IEP for 1995–96 (her ninth grade year) included Inclusion English, a study skills class, behavior management, and a minimum of two hours of counseling a month. The amount of counseling could be greater if the counselor felt more time was needed. The IEP for the following year (a year in which it is clear that Sylvie's parents apparently had no intention of enrolling Sylvie in Dripping Springs I.S.D.) dropped the English and study skills components. However, these components could have been added as electives if Sylvie had ever returned to Dripping Springs I.S.D. and she also may have been eligible for additional services had she returned. There was testimony that additional services could have been provided to Sylvie had she returned.

A follow-up ARD was held on May 13, 1996. Ms. Carter left the meeting prior to its conclusion because she was distressed that Sylvie, who had been diagnosed as bipolar, was being given no medication despite Ms. Carter's belief that she needed it, and she was still "mopping floors" at Élan because Sylvie's mom had refused Sylvie's letters of "confession, guilt, and remorse." Sylvie's mother indicated that Sylvie didn't "get" the idea of positive peer pressure. Ms. Carter strongly disagreed with Sylvie's mother about whether Élan was a proper placement. Ms. Carter left the meeting because she felt any further discussion with Sylvie's mother would be futile.

Dripping Springs I.S.D. and Sylvie's parents had widely varying views of Sylvie. Dripping Springs I.S.D. saw Sylvie as an intelligent child with minimal disabilities who chose not to complete school work due to lack of motivation and serious conflicts with her mother. Her behavior was also seen as not unusual for a ninth grader, a highly traumatic and transitional year for many students. Sylvie's performance on standardized achievement tests during her entire school career with Dripping Springs was, with the exception of math, at or

above her grade level. The school believed that Sylvie was learning despite her grades and concluded that the failing grades were a result of her unwillingness to complete assignments.

In contrast, Sylvie's parents viewed her as a clinically depressed and disruptive child who threatened and attempted suicide, habitually lied, had trouble making friends, had screaming arguments at home, and regularly failed to complete school work.[10] Sylvie's behavior at school (other than her failure to complete assignments) far exceeded her behavior at home. Sylvie's intelligence apparently allowed her to "present" excellently when she wished to, which masked her serious emotional disturbance. Sylvie also had deep rooted conflicts with her mother and stepfather, as she did not with school counselors, teachers, or officials.

On July 22, 1996, Sylvie's parents requested a due process hearing to appeal Dripping Springs I.S.D.'s refusal to pay for Élan. In preparation for the hearing, Sylvie was evaluated by two psychologists, one for each side. The psychologists tested Sylvie and found her to have a high I.Q. (122–125). Sylvie was found to have a learning disability in math. Except for math, Sylvie was at or above grade level in every subject. Both psychologists felt that Sylvie had been depressed for at least two years and had problems paying attention (ADD), but neither thought her to also be hyperactive (ADHD). Both psychologists agreed that Sylvie's primary need was for counseling at some point. The psychologists, predictably, disagreed as to the propriety of the placement at Élan, with Mr. Yahr recommending placement at Élan and Dr. Keene stating that Élan was not a good placement and recommending individual, family, and group therapy, with carefully supervised medication if she was willing. Dr. Keene indicated that even though Sylvie had been failing certain classes, it was clear from her scores on achievement tests that she was still learning regardless of her grades. Dr. Keene also believed that Sylvie's emotional disturbance had little significant impact on her educational achievement. While Dr. Keene stated that Élan was a good placement for oppositional/defiant teenagers and for those who used and abused drugs or were otherwise antisocial, Dr. Keene believed it was the exact opposite of what Sylvie needed.

The due process hearing was held November 12–16, 1996 before a Special Education Hearing Officer for the State of Texas. The hearing officer issued her findings on January 10, 1997. The hearing officer found that Dripping Springs I.S.D.'s IEP was inadequate because it failed to recognize or take into accounts Sylvie's serious emotional disturbance. However, the hearing officer also found that the placement at Élan was not appropriate because it was not the least restrictive environment. As such, the hearing officer concluded that Dripping Springs I.S.D. was not required to pay for Sylvie's placement at Élan. The hearing officer did find that the school was required to offer one hour a week of individual or family therapy, retroactive to January 1996.

Defendants allege that the hearing officer was correct in determining that Élan was an inappropriate setting. Defendants assert that DSISD has a full continuum of placements available to serve Sylvie's needs and that residential placement at Elan violated the rule of "least restrictive placement." DSISD argues that Sylvie's problems resulted from conflicts with her mother and stepfather and do not justify holding the school district liable for a residential placement.

---

**10.** Unlike the hearing officer, the undersigned does not believe that the school district "blamed" Sylvie's mother for Sylvie's problems. Rather, the evidence is clear that Sylvie's mother was deeply involved with Sylvie and tried very hard to help and understand Sylvie. Regardless, Sylvie's relationship with her mother remained troubled.

Plaintiff responds that her markedly improved performance at Elan disproves the school district's argument that it was adequately meeting her needs. Plaintiff argues that her failing grades at DSISD and her far higher grades at Elan show that is meeting her needs. Plaintiff asserts that the hearing officer was incorrect in determining that Elan was not an appropriate educational setting and that Sylvie's performance at Elan establishes that it is the right setting for her.

Defendants reply that the hearing officer's findings are entitled to due deference but that the officer erred in finding that DSISD was not providing a free appropriate public education (FAPE). Defendants assert that Sylvie was provided an appropriate Individual Education Plan (IEP) and that Elan is not the least restrictive environment. Defendants conclude by asserting that even if a FAPE was not provided in the past, Sylvie's parents rejected a settlement offer in September of 1996 that would have provided Sylvie with the necessary skills to succeed in school.

### LEGAL STANDARDS

In 1975, Congress passed the Education of the Handicapped Act ("EHA"), now known as the Individuals with Disabilities Education Act (IDEA) following various amendments. The purpose of this legislation is "to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c).[11]

IDEA is designed to encourage states to develop special education programs for disabled students. IDEA mandates that a state must provide all disabled children a "free appropriate public education" (FAPE) in return for federal funding. 20 U.S.C. § 1412(1). The term 'free appropriate public education' means special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title. 20 U.S.C. § 1401(18).[12]

In order to ensure a disabled child's right to free appropriate public education, the Act mandates that an Individualized Educational Program (IEP) be developed for each child. Formulation of the IEP is done by an Admission, Review and Dismissal ("ARD") committee made up of representatives from the local education agency or intermediate educational unit plus the child's parents. 20 U.S.C. § 1401(a)(20). The IEP must include a statement (1) of the present levels of educational performance of the child, (2) of the

---

11. The 1990 amendments substituted "Individuals with Disabilities Education Act" for "Education of the Handicapped Act." See Pub.L. No. 101– 476, § 901(a)(1), 104 Stat. 1103, 1141–42 (1990), codified at 20 U.S.C.A. § 1400(a) (West Supp.1997). For ease of reference, the undersigned refers only to the IDEA, even when discussing cases interpreting the Act prior to the 1990 amendments.

12. Texas fulfills its IDEA obligations through a statutory and regulatory scheme relating to the state's special education program. See Tex.Educ.Code Ann. §§ 29.001–29.014; 19 TAC §§ 89.1001–89.1190 (1997); see generally Frank Kemerer & Jim Walsh, The Educator's Guide to Texas School Law 77– 100 (4th ed.1996). The state requires that "the agency shall develop, and modify as necessary, a statewide design, consistent with federal law, for the delivery of services to children with disabilities in this state that includes rules for the administration and funding of the special education program so that a free appropriate public education is available to all of those children between the ages of three and 21." Tex.Educ.Code Ann. § 29.001. The state specifically permits school districts to enter into a contract to jointly operate special education programs (as occurred here), and provides that funds to which the cooperating districts are entitled may be jointly allocated in accordance to the districts' agreement. Id. at § 29.007.

annual goals, including shortterm instructional objectives, (3) specific educational services to be provided, (4) projected date for initiation and anticipated duration of services, and (5) evaluation procedures. *Id.* The IEP must also include, to the extent possible, "mainstreaming" of the disabled student, i.e., instruction in a regular, not special, education setting. *See* 20 U.S.C. § 1412(5).

The "free appropriate public education" tailored by an ARD Committee and described in an IEP, however, need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him "to benefit" from the instruction. *Cypress–Fairbanks I.S.D. v. Michael F.*, 118 F.3d 245, 247–48 (5th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 690, 139 L.Ed.2d 636 (1998). Although the individual educational program must be "reasonably calculated to afford some educational benefit to the disabled child," the program need not provide services beyond a "basic floor of opportunity." *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 198–201, 102 S.Ct. 3034, 73 L.Ed.2d 690, 102 S.Ct. 3034 (1982); *Cypress–Fairbanks I.S.D,* 118 F.3d at 248. In those instances when a suitable or "appropriate" public educational placement is not available for a disabled child within a state or local school district, the district must implement an IEP that includes the costs of sending the child to an appropriate private institution. *Cy–Fair I.S.D.,* 118 F.3d at 248.

Procedures for appealing an IEP are set out in IDEA as follows:

(b) Required procedures; hearing

 (1) The procedures required by this section shall include, but shall not be limited to—

 (A) an opportunity for the parents or guardian of a child with a disability to examine all relevant records with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child;

 (B) procedures to protect the rights of the child whenever the parents or guardian of the child are not known, unavailable, or the child is a ward of the State, including the assignment of an individual (who shall not be an employee of the State educational agency, local educational agency, or intermediate educational unit involved in the education or care of the child) to act as a surrogate for the parents or guardian;

 (C) written prior notice to the parents or guardian of the child whenever such agency or unit—

 (i) proposes to initiate or change, or

 (ii) refuses to initiate or change, the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child;

 (D) procedures designed to assure that the notice required by clause (C) fully informs the parents or guardian, in the parents' or guardian's native language, unless it clearly is not feasible to do so, of all procedures available pursuant to this section; and

 (E) an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child.

(2) Whenever a complaint has been received under paragraph (1) of this subsection, the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational

agency. No hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the education or care of the child.

(c) Review of local decision by State educational agency

If the hearing required in paragraph (2) of subsection (b) of this section is conducted by a local educational agency or an intermediate educational unit, any party aggrieved by the findings and decision rendered in such a hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing. The officer conducting such review shall make an independent decision upon completion of such review.

(d) Enumeration of rights accorded parties to hearings

Any party to any hearing conducted pursuant to subsections (b) and (c) of this section shall be accorded—

(1) the right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities,

(2) the right to present evidence and confront, cross-examine, and compel the attendance of witnesses,

(3) the right to a written or electronic verbatim record of such hearing, and

(4) the right to written findings of fact and decisions (which findings and decisions shall be made available to the public consistent with the requirements of section 1417(c) of this title and shall also be transmitted to the advisory panel established pursuant to section 1413(a)(12) of this title).

(e) Civil action; jurisdiction

(1) A decision made in a hearing conducted pursuant to paragraph (2) of subsection (b) of this section shall be final, except that any party involved in such hearing may appeal such decision under the provisions of subsection (c) and paragraph (2) of this subsection. A decision made under subsection (c) of this section shall be final, except that any party may bring an action under paragraph (2) of this subsection.

(2) Any party aggrieved by the findings and decision made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, and any party aggrieved by the findings and decision under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

*See* 28 U.S.C. § 1415.

 The standard of review used by courts reviewing cases under IDEA differs from the traditional summary judgment standard outlined in *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under IDEA, a reviewing court must apply a "modified de novo review" standard. *Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). This means that the court reviews the record "virtually" *de novo,* including the decisions of the state level and independent hearing officers, and the materials considered in the underlying state administrative proceedings. *Id.* at 206, 102 S.Ct. 3034; *Cypress–Fairbanks I.S.D.,* 118 F.3d at 252. While according "due weight" to the hearing officer's find-

ings, the court must ultimately reach an independent decision based on a preponderance of the evidence. *Cypress–Fairbanks I.S.D.,* 118 F.3d at 252. In the course of this proceeding, the court may consider evidence not before the hearing officer. *Id.*

■ A federal court's review of a special hearing officer's decision requires a two-part inquiry. First, the court must decide whether the state, through its local education agency or intermediate educational unit, complied with the procedures set forth in the IDEA. *Board of Education v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). Second, the court must determine whether the IEP developed for the disabled child was "reasonably calculated to enable the child to receive educational benefits." *Id.; see also Buser v. Corpus Christi I.S.,* 51 F.3d 490, 492 (5th Cir.), *cert. denied,* 516 U.S. 916, 116 S.Ct. 305, 133 L.Ed.2d 210 (1995). Because there is no challenge to the procedures used in this case, the undersigned proceeds to the second prong of the test.

## ANALYSIS

■ The placement of Sylvie at Élan requires this Court to consider the application of IDEA to a "voluntary" placement of a student in a restrictive private school. The undersigned's task is complicated by the fact that "the IDEA and its implementing regulations are amorphous in design and imprecise in message" *Cefalu v. East Baton Rouge Parish Sch. Bd.,* 103 F.3d 393, 397 (5th Cir.1997) (calling IDEA

a "vague and difficult statute."). In addition, certain portions of IDEA—concerning entitlement to educational benefits for students enrolled in private schools—were significantly amended in 1997, further complicating the analysis.[13] *See* Individuals with Disabilities Education Act Amendments of 1997, Pub.L. No. 105–17, 111 Stat. 37 (1997). These amendments state that they take effect upon enactment, which is June 4, 1997 and the amendments are prospective only. *Cypress–Fairbanks I.S.D.,* 118 F.3d at 247 n. 1.[14]

There is no question that under certain limited circumstances IDEA authorized full reimbursement for unilateral parental placements in private schools. *School Comm. of Burlington v. Department of Educ., of Mass.,* 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). *Burlington* held that the IDEA's grant of equitable authority under § 1415(e)(2) empowers a court "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Id.; see also Doe v. Metropolitan Nashville Public Schs.,* 133 F.3d 384, 388 (6th Cir. 1998) (permitting reimbursement for unilateral placement upon a finding of sufficiently serious procedural failures by the school district).

Reviewing courts should first review the record to determine if the facts establish that the school district's individualized pro-

---

13. "In amending IDEA, Congress substantially limited the rights of disabled children enrolled by their parents in a private school." *See* 20 U.S.C. § 1412(a)(10)(C)(i) (West Supp. 1998); *Peter v. Wedl,* 155 F.3d 992, 998 (8th Cir.1998). However, these amendments do not apply when an IEP was improper (and a FAPE therefore not provided in the public school) and the private placement is the proper placement. "Subject to subparagraph (A), this part does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility **if that agency made a free**

**appropriate public education available to the child** and the parents elected to place the child in such private school or facility." Individuals with Disabilities Education Act Amendments of 1997, Pub.L. No. 105–17, tit. 1, § 612(a)(10)(A), (C), 111 Stat. 37, 62–63 (1997) (emphasis added).

14. *See Fowler v. Unified Sch. Dist. No. 259,* 128 F.3d 1431, 1436 (10th Cir.1997) (1997 amendments to IDEA are to be applied "only to events occurring after the amendments' effective date")

gram provided the disabled student some educational benefit. If so, the inquiry ceases. If not, however, the court then turns to whether the placement was appropriate under the IDEA. Sylvie's parents may only recover the costs they incurred in unilaterally placing Sylvie at Élan if they establish that (1) the IEPs in effect at the time that Sylvie was removed from Dripping Springs I.S.D. were not reasonably calculated to provide Sylvie with a meaningful educational benefit, and (2) the parents' placement of Sylvie at Élan was appropriate under the IDEA.

### A. Did Dripping Springs I.S.D.'s IEP Provide Educational Benefit?

■ There are four factors that can serve as indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA. These are: (1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) positive academic and non-academic benefits are demonstrated. *Cy–Fair I.S.D.*, 118 F.3d at 253 (citing with approval the District Court record). These four factors are derived from and track the federal regulations which implement the IDEA. *Id.* at n. 29, *citing* 34 C.F.R. §§ 300.346(a) and 300.531–2 (assessment); 34 C.F.R. §§ 300.500 (least restrictive environment); 34 C.F.R. §§ 300.343–345 (team approach); and 34 C.F.R. § 300.346(a)(5) (demonstrated outcomes). The Court addresses each of the *Cy–Fair* factors in turn.

### A. Was the Dripping Springs I.S.D.'s Program Individualized?

IDEA requires that an IEP be individualized for each student. In the current case, the undersigned has carefully examined the administrative record and can find no evidence that Sylvie's program was not tailored to her needs. It is true that Syl-

vie was and is a bright child who, regardless, was failing some of her classes during her freshman year of high school. The primary reason for her failures was her refusal to complete homework. The issue for the undersigned is "why did Sylvie refuse to do homework and what should the school have done about it?" The school could no more force Sylvie to do homework than could her mother. Sylvie appears to have been a rebellious child who, despite her intelligence, refused to adjust to the school's requirements. She was also clearly emotionally disturbed. However, she was receiving psychological help from many fronts. There is no evidence that Sylvie could not, in fact, do the work had she chosen to do so.

Sylvie's mother makes much of the "Suicide Contract" entered into after Sylvie made a suicidal gesture in November of 1995. After reviewing the entire record, the undersigned believes the school acted appropriately in assessing Sylvie's risk of suicide. The undersigned is confused as to counsel's repeated emphasis on the fact that Sylvie's mother was unaware of the contract. The mother was obviously aware of Sylvie's suicide threat. What possible difference could the existence of this relatively standard "contract" make in the mother's treatment of Sylvie? In other words, how would her knowledge of the contract have changed the mother's behavior? The contract was entered into in an excess of caution by a counselor who did not even really believe that Sylvie was a serious suicide threat but rather was using the threat of suicide to manipulate her mother. Indeed, no more suicidal gestures occurred after the contract. The undersigned does not find that the school erred in any way in getting Sylvie to promise to talk to someone before committing suicide. Because Sylvie's mother knew of the incident that caused the contract, there was no error or damage in failing to disclose it to her.

Although counsel for Plaintiff faults the school district for not obtaining a psycho-

logical evaluation, Sylvie was receiving a significant amount of psychological services during this time, which included school services as well as a private psychologist/psychiatrist and even, for a few months, had a child psychologist living in her home. The school was aware of these outside counselors. None of the outsiders to Dripping Springs I.S.D. ever recommended Sylvie be classified as seriously emotionally disturbed until after she was at Élan. Dr. Ceballos eventually certified Sylvie as having this disturbance, but Sylvie's behavior at *school* did not put the school on notice of her serious emotional issues.

The undersigned has examined the school's efforts to reach and teach Sylvie, including the March, 1996 IEP modifications. These modifications could have, indeed probably would have, resolved the homework issue. The undersigned doubts, however, if anything other than time and/or distance could have resolved the parent/child conflicts which plagued Sylvie and her parents. There was abundant evidence that Sylvie's problems during her ninth grade year were not unique but were, in fact, common for this traumatic age. There is no evidence that Sylvie would not have progressed quite well at Dripping Springs High School if she had been in a placement other than with her mother. There is also no evidence that she would not have outgrown her problems over time and been able to return to her mother's home.

The undersigned sympathizes with Sylvie's parents in their travails over Sylvie and certainly does not fault them. It is clear they tried very hard to reach Sylvie and that the separation of Sylvie and her mother for a time may regrettably have been necessary. However, the undersigned does not see any *educational* needs Sylvie had that were not being met by Dripping Springs I.S.D.

## B. Least Restrictive Environment.

Dripping Springs I.S.D. clearly had available multiple setting which would have been less restrictive than Élan. The residential treatment was for personal, not educational, needs. Dripping Springs I.S.D. clearly satisfies this element.

## C. Were the Services Provided in a Coordinated and Collaborative Manner by the Key "Stakeholders"?

Sylvie and her mother actively participated in the ARD meetings. The undersigned can find no evidence that Sylvie's well-being was not of primary concern not only to her parents but also to the school. Despite the fact that Sylvie was failing some of her classes, she appeared relatively happy and well-adjusted while at school and she regularly attended school and counseling. The conflict was homework and Sylvie's unwillingness to do it. The modified IEP, formulated prior to Sylvie's running away, would have solved the homework issue. The school was consistently responsive to Sylvie's needs. While Sylvie should perhaps have been diagnosed earlier as emotionally disturbed, she was receiving counseling during the majority of this time. At the January ARD, Sylvie's mother discouraged further testing and indicated that Dr. Ceballos, Sylvie's private psychiatrist, was available to render an opinion. While it was doubtless terrifying for Sylvie's parents when she ran away, there is no evidence that her running away was school related. School was not even in session the following week. When Sylvie was found, the preponderance of the evidence establishes that she did not say she didn't want to go back to school. Rather, she did not want to go back to her mother's house. The school's counselors and teachers were actively involved with Sylvie's mother in trying to help Sylvie and therefore satisfies this prong.

## D. Were Positive Academic and Non-Academic Benefits Demonstrated?

Despite Sylvie's failing grades in some of her classes, her achievement tests

stayed at grade level or higher except for math. All of Sylvie's teachers believed her to have been learning. The failing grades were attributable to not doing homework and, sometimes, as a result of failing quizzes because she didn't do her homework. While Sylvie's grades at Élan are noticeably higher, there was evidence that the academic standards were somewhat lower and class hours were certainly less.[15] Even if this is not true, there was no homework at Élan. If there had been no true "homework" at Dripping Springs I.S.D., Sylvie's grades would doubtless have risen dramatically. There was abundant evidence that ninth grade is a traumatic, transitional year for many students. Many students receive failing grades during their ninth grade year but few do by their senior year. Maturation is, in general, the reason for the improvement.

Sylvie's parents believed that Élan was best for their child. It is possible that Élan was, in actuality, the optimal setting for Sylvie. The results certainly indicate that it was a good setting for Sylvie. However, a school is not required to provide the best setting for its students. If that were true, every student would be taught in very small classes or one-on-one so that individual attention from teachers was readily available at all times. Fiscal constraints, however, require otherwise. All that a school is required to do is ensure that its students are receiving educational benefit. Sylvie was doing so. No more is required.

With respect to non-academic benefits, there was evidence that Sylvie made friends at Dripping Springs I.S.D. and in general had positive peer relationships. One fellow student appeared to have been verbally harassing her. Even though the school was told of this conduct, the school was unable to correct this misbehavior because Sylvie's mother could not supply the school with the offender's full name and Sylvie's mother refused to allow school officials to question Sylvie about the harassment. Other than this one incident, Sylvie appeared to also gain non-academic benefits from Dripping Springs I.S.D.

The above factors indicate that Sylvie's IEP was a FAPE. AS such, the inquiry ends and judgment should be entered on behalf of the school district. In the alternative, the Court explores the placement at Élan.

### 2. Was Élan an Appropriate Placement?

One of the main concerns of Congress is that the state attempt, as best it can, to mainstream the child, that is, educate the disabled child among non-disabled children. *Flour Bluff I.S.D. v. Katherine M.,,* 91 F.3d 689, 691 (5th Cir.1996), *cert. denied,* 519 U.S. 1111, 117 S.Ct. 948, 136 L.Ed.2d 836 (1997). Under the IDEA, a private placement at public expense is appropriate only if a school district is unable to provide the necessary services to the disabled student in a public school. *See* § 1413(a)(4)(B).

> Under the regulations governing the placement of a student in the "Least Restrictive Environment," a child should attend his or her neighborhood school unless the child's IEP requires arrangements that do not exist at that school. In fact, if the child requires such arrangements, the school district has numerous options (public or private) on placing the student. The regulations, not the statute, provide only that the child be educated "as close as possible to the child's home."

*Flour Bluff I.S.D.,* 91 F.3d at 693–94.

The hearing officer found that Élan was not the least restrictive environment for Sylvie. The undersigned agrees. The fact that Sylvie did well at Élan does not satisfy the mandate of IDEA with respect to least restrictive environment. There were numerous less restrictive alternatives than Élan at Dripping Springs I.S.D. that Sylvie's parents refused to try. All of these intermediate, less restrictive alternatives

---

**15.** Four hours of school is far less than that required in Texas public high schools.

were skipped over in Sylvie's move from Dripping Springs High School to Élan. As such, Plaintiff fails this prong.

### CONCLUSION

The Court determines that Judgment should be entered in favor of Defendant. As such, this Court will enter a contemporaneous judgment this date dismissing the case in full.

### FINAL JUDGMENT

The Court this date entered a Memorandum Opinion in the above-referenced cause. In the Memorandum Opinion, the Court determined that judgment would be granted in favor of Defendant. All pending motions are denied as moot and any relief not expressly granted in this judgment or in the Memorandum Opinion is **DENIED.** All parties will bear their own costs.